# In the United States Court of Federal Claims

**No. 18-1586C**
**Filed: September 10, 2021**

```
* * * * * * * * * * * * * * * * * *
```
| | |
|---|---|
| **DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY,** | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| **UNITED STATES,** | * |
| | * |
| Defendant. | * |

```
* * * * * * * * * * * * * * * * * *
```

**Frederick A. Douglas**, Douglas & Boykin PLLC, Washington, D.C., for plaintiff. Of counsel was **Tram T. Pham**, Douglas & Boykin PLLC, Washington, D.C.

**Douglas T. Hoffman**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Claudia Burke**, Assistant Director, Commercial Litigation Branch, **Martin F. Hockey, Jr., Jr.**, Acting Director, Commercial Litigation Branch, and **Brian M. Boynton**, Acting Assistant Attorney General, Civil Division.

## O P I N I O N

<u>HORN, J.</u>

The above-captioned case involves a dispute between the District of Columbia Water and Sewer Authority (DCWS) and the Armed Forces Retirement Home of Washington, D.C. (AFRH), over the alleged lack of payment by AFRH for sewer services provided by DCWS. Plaintiff's amended complaint seeks payment for sewer services, including impervious area charges, or what plaintiff refers to as stormwater charges.[1] In

---

[1] As explained on the DCWS website:

> Impervious surfaces such as rooftops, paved driveways, patios, and parking lots are major contributors to stormwater runoff entering the District's combined sewer system. This adds significantly to pollution in the Anacostia and Potomac Rivers and Rock Creek.

> The Clean Rivers Impervious Area Charge (CRIAC) is a fair way to distribute the cost of maintaining storm sewers and protecting area

the case currently before the court, plaintiff does not seek payment for the provision of non-sewage-related-water to the AFRH by the District of Columbia (the District). Plaintiff's amended complaint alleges amounts due in excess of $12,000,000.00 which plaintiff asserts have not been paid by the AFRH over a number of years.[2] Plaintiff asserts entitlement to payment for sewer services pursuant to the District of Columbia Public Works Act of 1954, Pub. L. No. 83-364, 68 Stat. 101 (1954) (the 1954 Act), as amended and codified in the Code of the District of Columbia (D.C. Code) at § 34-2101, et seq., which plaintiff argues obligates the United States to compensate DCWS for sewer services rendered to the AFRH. The United States responds by relying on a 1938 agreement between DCWS' predecessor-in-interest and the AFRH's predecessor-in-interest (the 1938 Agreement), in which, according to defendant, DCWS' predecessor-in-interest agreed to provide water and sewer services to the AFRH's predecessor-in-interest, free of charge and in perpetuity, in exchange for AFRH's predecessor-in-interest providing DCWS' predecessor-in-interest an easement to build and access a critical water reservoir on the property of AFRH's predecessor-in-interest. Plaintiff disputes defendant's interpretation of the 1938 Agreement, arguing that the 1938 Agreement did not cover sewer services free of charge and in perpetuity. Plaintiff also argues that, regardless of whether the 1938 Agreement included sewer services, the alleged mandatory payment obligations of the United States set forth in the 1954 Act, as amended, controls. Defendant

---

waterways because it is based on a property's contribution of rainwater to the District's sewer system. Because charges are based on the amount of impervious area on a property, owners of large office buildings, shopping centers and parking lots will be charged more than owners of modest residential dwellings.

All residential, multi-family and non-residential customers are billed a CRIAC. The charge is based on an Equivalent Residential Unit (ERU). An ERU is a statistical median of the amount of impervious surface area in a single-family residential property, measured in square feet.

Available at https://www.dcwater.com/impervious-area-charge (last visited Sept. 10, 2021).

[2] Plaintiff's amended complaint and subsequent submissions are unclear as to the date starting from which plaintiff seeks compensation for sewer services rendered, and the amount of damages requested. In its amended complaint, plaintiff states that it has been billing the AFRH since 2004 without receiving any payments, however, at oral argument, plaintiff indicated that it was only requesting payments allegedly due starting in January of 2012. Moreover, in supplemental briefing to the court, plaintiff states that it is requesting "judgment in the amount of $9,234,228.76 for past and estimated sewer services and for past and estimated stormwater costs," which plaintiff appears to have calculated from 2012 to 2019, and, as discussed above, was the amount requested in its April 2019 submission of its Federal Cost of Service Estimates (FCSE) for the fiscal year 2021. Plaintiff also requests "an Order approving the methodology for calculating the Federal Cost of Service Estimates for FY2022 and FY2023."

filed a motion to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC). The parties also filed cross-motions for summary judgment, all of which were fully briefed.

## FINDINGS OF FACT

The AFRH, which was originally established in 1851 as the Military Asylum of Washington, D.C., was created for

> every soldier of the army of the United States who shall have served, or may serve, honestly and faithfully twenty years in the same, and every soldier, and every discharged soldier, whether regular or volunteer, who shall have suffered by reason of disease or wounds incurred in the service and in the line of his duty, rendering him incapable of further military service, if such disability has not been occasioned by his own misconduct . . . .

31st Cong. § 4 (1851). After a number of re-designations by Congress, on September 7, 1972, the AFRH was designated as "an independent establishment in the executive branch" for the purpose of providing "residences and related services for certain retired and former members of the Armed Forces." See 24 U.S.C. § 411 (2018). At the time of the 1938 Agreement, discussed below, the AFRH was called the United States Solders' Home (the Soldiers' Home).

Plaintiff asserts that "[t]he various buildings on the AFRH-W [Washington] grounds are connected to separate water and sewer mains operated by" DCWS. Plaintiff offers a history of the organization of the District of Colombia Water and Sewer Departments, stating that "[s]ewer lines were mapped separately from water mains as early as the late 1800s," and that, unlike water in the water mains, the sewer mains "provides non-potable water for waste products and removes it for treatment." Plaintiff further provides that, dating back to the early 1900s, "water and sewer services were overseen by the District of Columbia Water Department and the Sewer Department, respectively." Plaintiff states, that the Sanitary Engineer of the Sewer Department oversaw "construction and maintenance of the sewer system," while the Superintendent of the Water Department oversaw the Water Department. Plaintiff also states that the head of each department also provided separate annual reports of their respective departments' activities.

In the 1929 edition of the D.C. Code, which existed through 1939 by way of five supplements thereto, relevant water and sewer provisions were contained in title 20, titled: "Municipality of the District of Columbia." The "Drainage of Lots" provisions were included as Part 6 of Chapter 5, "Health," in title 20 of the D.C. Code. See D.C. Code, title 20, §§ 1311-1314 (1929). Chapter 6 of title 20 was titled: "Water." See id. §§ 1371–1408. The provision in section 1311, part of the "Drainage of Lots" provisions in Chapter 5, stated that lots on streets where there was a "public sewer" were required to be "connected with said sewer in such manner that any and all of the drainage of such lot, whether water or liquid refuse of any kind, except human urine and fecal matter, shall flow into said sewer." Id. § 1311.

Despite the separate labels of "Drainage of Lots" and "Water," each set of provisions contained instructions pertaining to both water and sewer services. For instance, section 1311 of title 20 of the D.C. Code, the section discussed immediately above, which was part of the "Drainage of Lots" provisions in Chapter 5, also provided that lots on streets which had both a "public sewer and water main" were required to "be connected with said sewer and also with said water main in such manner that any and all of the drainage of such lot, whether water or liquid refuse of any kind shall flow into said sewer." D.C. Code, title 20, § 1311. Similarly, section 1380 of title 20 of the D.C. Code, which was part of the "Water" Chapter, provided that the "Commissioners of the District of Columbia are authorized . . . to construct water mains and service sewers in any street, avenue, road, or ally in the District of Columbia." Id. at § 1380; see also id. at § 1387 (part of the "Water" Chapter, and which provided a definition of "service sewer" as "a sewer with which connection may be directly made for the purpose of providing sewerage facilities to abutting property," and that "such sewers shall be so indicated on the records of the sewer division of the engineer department of the District of Columbia").

Regarding payment, the provision in section 1381 in the "Water" Chapter stated by 1939 that assessments were to be "levied against all lots or land abutting upon that part of the street, avenue, road, or ally," "at the rate of one dollar and twenty-five cents per linear front foot" where a "water main shall be laid," and "at the rate of one dollar per linear front foot" where a "sewer shall be laid." D.C. Code, title 20, § 1381 (Supp. V, 1939). In the D.C. Code at title 20, section 1390, part of the "Water" Chapter, an assessment for "water rents" was set forth for the "use of water for domestic purposes through unmetered services," at "$9.85 per annum for all tenements two stories high, or less, with a front width of sixteen feet, or less," and "for each additional front foot or fraction thereof greater than one-half, 62 cents; and for each additional story or part thereof, one-third of the charges as computed above." Id. § 1390. The provision at section 1390 in the D.C. Code at title 20, also stated that "[f]or the use of water through metered services," there was "a minimum charge of $8.75 per annum for seven thousand five hundred cubic feet of water, and 7 cents per one hundred cubic feet for water used in excess of that quantity." Id. There was no indication in the 1929 edition of the D.C. Code, or its supplements through 1939, that a reoccurring fee was charged for the use of water for sewage purposes.

The 1938 Agreement

On October 4, 1937, the Honorable Melvin C. Hazen, the President of the Board of Commissioners of the District of Columbia, wrote the following letter to Major General Frederick W. Coleman, the Governor of the Soldiers' Home, one of the predecessors-in-interest to the AFRH:

The Commissioners of the District of Columbia wish you to know that it is necessary for them to construct a new water distribution reservoir of approximate elevation of 250 feet above mean tide level in order to properly operate and safeguard the supply and distribution of water in the District of Columbia.

4

A study of contours of the city indicates that the only suitable location for this reservoir that is 250 foot elevation is the United States Soldiers' Home Grounds.

Accordingly, request for authority and funds for the construction of a reservoir and pipe line in the United States Soldiers' Home Grounds is embodied in the Annual Estimates of the District of Columbia Water Division for 1939, as shown on the attached sketch, which will shortly be placed before the Bureau of the Budget.

Your comments and cooperation in this matter are requested.

(capitalization in original).

On October 20, 1937, Major General Coleman replied with an acknowledgement of receipt, and wrote to the Honorable Melvin C. Hazen:

On account of the fact that the Soldiers' Home is a public trust owned and operated practically in its entirety from contributions received from enlisted men on the active list of the Regular Army, I would suggest that the legislative action contemplated by you be suspended until such time as this matter can be considered by the Board of Commissioners of the Home. Your letter will be presented to the Board and I will be glad to communicate further with you when the Board has taken action thereon.

(capitalization in original). On October 25, 1937, the Board of Commissioners of the Soldiers' Home "convened a Board Meeting . . . to discuss the matter." At the October 25, 1937 Board of Commissioners meeting General Pillsbury, who was a member of the Board of Commissioners of the Solders' Home, stated :

I have gone into the matter and I believe without any question this proposed installation is necessary to safe-guard the water supply of the District of Columbia in the increasing drain and demand on the service. The increased water demand is such that the water is filtered at the McMillan plant here at an excessive rate. This installation is designed to offer a reserve supply so that the filters could be run at the regular rate in the day time and the surplus water filtered at night could be drawn on during the following day. There is an emergency in the water supply of the District that I think makes this installation necessary. The only reasonable solution is the installation of the reservoir so as to afford a reserve supply.

Nevertheless, Major General Coleman, then the President of the Board of Commissioners for the Soldiers' Home, initially rejected the proposal to build the reservoir. In a November 2, 1937 letter from Major General Coleman to the Honorable Melvin C. Hazen, the President of the Board of Commissioners of the District of Columbia,

Major General Coleman wrote:

> [A]lthough the United States has title to the land where the District desires to construct the new reservoir, the deed [of the Soldiers' Home] contains a definite limitation as to its use, in that the land is held " * * * In Trust nevertheless for sole use, benefit and behoof of the Commissioners of the Soldiers' Home and for no other use or purpose whatsoever: * * * " and that the Commissioners held the property in trust for the use and benefit of the soldiers of the United States Army.

> A license, grant, or deed to the District of Columbia which would enable the District of Columbia to establish a reservoir within this tract would constitute a violation of the trust imposed upon the Commissioners of the Home unless such action is clearly to the best interest of the old soldiers who are the beneficiaries of the trust. In determining what these "best interests" are, the potential applicability of the property, among other things, must be considered. The location of the proposed reservoir is one of the logical building sites in event of enlargement of the Home and should be reserved for such purpose. In all matters affecting the Home the Commissioners regard the trust as being concerned not only with the present or with the immediate future but with the years far ahead.

> The Commissioners of the Home are informed and believe that there are, in fact, other points in the District of Columbia of sufficient elevation and accessibility which can be used for the uprose of operating and safeguarding the supply and distribution of water in the District of Columbia

> It was the conclusion of the Board of Commissioners of the Home, having in mind the vested interest of the beneficiaries of the trust, that it can not, at this time, take favorable action with respect to the proposed construction.

> In view of what has been stated above, I am directed by the Board of Commissioners to request that you withdraw from you estimates for 1939, which will shortly be placed before the Bureau of the Budget, any request for authority or funds for the construction of a reservoir on Soldiers' Home property and that the Board of Commissioners of the United States Soldiers' Home be advised of your action in the matter.

(capitalization and ellipses in original). The District complied with the Soldiers' Home's request for the District to withdraw from its budget request the funds for the construction of the reservoir, however, discussions between the Soldiers' Home and the District continued. In a letter dated January 6, 1938 to Major General Coleman of the Soldiers' Home, the Honorable Melvin C. Hazen, President of the Board of Commissioners of the District of Columbia, wrote:

In view of the absolute necessity of ample water supply at adequate pressure, not only for Federal institutions but also in the interest of the general public welfare, your renewed consideration of our request for permission to locate a vitally important storage reservoir on high ground within the territory under the jurisdiction of the Board of Commissioners of the United States Soldiers' Home is requested.

Our renewed request that you grant this permission would not be made but for the fact that the proposed site is the only one considered feasible. The engineers of the District of Columbia Water Division have made a comprehensive survey of all possible sites for a reservoir and after exhaustive study have reluctantly reached the conclusion that all contemplated alternates are impracticable.

The Commissioners are willing, with your advice and approval, to recommend payment of a reasonable price for the site in question since the need for the construction of this reservoir is so urgent, and they therefore are most reluctant to postpone a recommendation for the enactment of legislation beyond the present (75th) Congress which would authorize its construction and the necessary appropriation. The Commissioners are willing that the price be determined by a board of appraisers selected jointly by the Board of Commissioners of [the] Solders' Home and the Board of Commissioners of the District of Columbia.

(capitalization in original).

The Honorable Melvin C. Hazen's renewed request to construct the reservoir on the premises of the Soldiers' Home was subsequently discussed by the Board of Commissioners of the Soldiers' Home and, on February 1, 1938, the 1938 Agreement was signed and executed. The 1938 Agreement stated:

This Agreement made this 1st day of February, 1938, by and between Frederick W. Coleman (Retired), Governor of the United States Soldiers' Home; Major General Charles R. Reynolds, The Surgeon General; Major General Edgar T. Conley, The Adjutant General; Major General Henry Gibbins, The Quartermaster General; Major General Julian L. Schley, The Chief of Engineers; Major General Allen W. Gullion, The Judge Advocate General; and Major General Frederick W. Boschen, The Chief of Finance, constituting the Board of Commissioners of the United States Soldiers' Home, parties of the first part, and Melvin C. Hazen, George E. Allen, and Colonel Dan I. Sultan, constituting the Board of Commissioners of the District of Columbia, parties of the second part, witnesseth:

That Whereas the Commissioners of the District of Columbia have made application to the Board of Commissioners of the United States Soldiers' Home for permission to install and maintain an underground reservoir, for

use in connection with the water supply system of the District of Columbia, on lands constituting a part of the Soldiers' Home grounds;

And Whereas the lands on which it is proposed to construct said reservoir were conveyed to the United States of America in Trust "for the sole use, benefit and behoof of The Commissioners of the Soldiers' Home and for no other purpos [sic] whatsoever";

And Whereas to grant the request of the District of Columbia would constitute a violation of the trust imposed unless such action is clearly to the best interest of the old soldiers who are the beneficiaries of the said trust;

And Whereas the Board of Commissioners of the United States Soldiers' Home at a meeting held on the 24th day of January, 1938, after careful consideration of all of the facts, have determined that the recognition of the perpetual right to the use of water from the water supply system of the District of Columbia, and the right to use water from the reservoir proposed to be installed on the Soldiers' Home grounds, with the right to tap the District of Columbia Water mains and use water therefrom to the extent necessary for the purpose of said Home, and the advantage of having a more continuous pressure for fire fighting purposes in the protection of the buildings and property of said Home resulting from the installation of the proposed reservoir, constitute a lasting benefit to said Home and adequate consideration for the grant of the privilege requested by the parties of the second part;

And Whereas the National Capital Park and Planning Commission has recommended the transfer of jurisdiction for the purposes and to the extent hereinafter set forth;

Now Therefore, pursuant to the authority vested in the Board of Commissioners of the United States Soldiers' Home and the Secretary of War, by Section 4815, United States Revised Statutes (U.S.C. 24:41), with the approval of the Secretary of War, as evidenced by signature hereto, the parties of the first part hereby grant to the parties of the second part, permission, and transfer jurisdiction to the extent hereinafter set forth, to install an underground reservoir, for use in connection with the water supply system of the District of Columbia, together with right-of-way for water mains leading to and from said reservoir, on and across the grounds of the United States Soldiers' Home, at the locations, and in the manner, and in accordance with the plans therefor, as more fully shown, described, and set out on the map attached hereto and made a part hereof, together with the right of ingress and egress thereto for the purpose of constructing, repairing and maintaining same, so long as the said reservoir is used in connection with the water supply system of the District of Columbia, and no longer, with the understanding that said grant is made in consideration of the perpetual

right to use water from the water supply system of the District of Columbia, as may be needed, for the purpose of said Home, including water for fire protection purposes without compensation therefore at any time, which right the said parties of the second part, under authority of the act of Congress approved May 20, 1932 (47 Stat. 161, U.S.C. 40:122), hereby grant, warrant and confirm to the parties of the first part.

The parties of the second part agree to repair all damages done to roads and property of the parties of the first part, in the construction, repair and maintenance of said reservoir, and to save the parties of the first part harmless from any damages or claims resulting from the occupation of the premises under this agreement by the parties of the second part.

It is mutually understood and agreed that the jurisdiction over said property hereby transferred to the parties of the second part is limited to that necessary in construction, repair and maintenance of the reservoir and water mains above mentioned, and in all other respects, including the power to police the property, jurisdiction retained by the parties of the first part.

This Agreement is made in anticipation of an appropriation to be made for the construction of said proposed reservoir, and in the event the necessary appropriation is not made within two years, this agreement shall become null and void and of no effect.

In Witness Whereof, the said parties have hereunto, and to a duplicate hereof of like tenor and affect, set their hands and seals, in the City of Washington and District of Columbia, the day and year first above written.

(capitalization in original).

On April 4, 1938, Congress passed the following legislation which provided:

For the construction of a reservoir of approximately fifteen million gallons capacity on the grounds of the United States Soldiers' Home, District of Columbia, including necessary appurtenances and auxiliaries, and including not to exceed $12,000 for the employment, by contract or otherwise, and without reference to section 3709 of the Revised Statutes (41 U.S.C. [§] 5) or the Classification act of 1923, as amended, of engineering and other professional services, $400,000, to continue available [sic] until June 30, 1940.

52 Stat. 190, 75th Cong. (1938).

On January 26, 1939, Major General Coleman of the Soldiers' Home wrote to the Honorable Melvin C. Hazen, the President of the Board of Commissioners of the District of Columbia, regarding the 1938 Agreement's applicability in the face of potential

legislation recommended by the District that would require the federal government "to purchase the water used by" the federal government. Major General Coleman's letter January 26, 1939 letter stated:

> There has been noted recently in the press apparently authentic statements that the Commissioners of the District of Columbia either have recommended or propose to recommend to the Congress that legislation be enacted which will require that Federal Government activities in the District of Columbia be required to purchase the water used by them.
>
> On February 1, 1938, the Commissioners of the District of Columbia and the Board of Commissioners of the U.S. Soldiers' Home entered into a contract of agreement where, in consideration of the authority given the former to erect and maintain a large water storage reservoir on the grounds of the Soldiers' Home, the perpetual right to free water for its use was granted to the latter. This agreement appears to be entirely satisfactory to both parties; it will result in a very considerable construction and maintenance savings to the District of Columbia and at the same time will satisfy the requirements of the Trustees of this Home in their responsibility to the trust obligation imposed upon them by law.
>
> In view of the existing contract above referred to, I feel that it is fair to assume that any proposed legislation on this subject will specifically exclude the U.S. Soldiers' Home from the provisions of any Act in reference hereto to be proposed to Congress by the Commissioners of the District of Columbia.

(capitalization in original).

The Honorable Melvin C. Hazen of the District responded in a letter to Major General Coleman of the Soldiers' Home, stating:

> On January 13, 1939, the Commissioners [of the District] transmitted to Congress a report of a study of the Water System authorized by Public Act No. 172, 75th Congress, First Session, approved June 29, 1937, and stated to Congress that it was their belief "that the Federal Government should reimburse the water fund for water used at the established meter rates, possibly with a preferential discount of about 10 %."
>
> The Commissioners are cognizant of the fact that a contract was entered into between the Soldiers' Home and the District under which the Home was given the perpetual right to free water. It is not intended to modify this contract in any way. When, as and if definite legislation is under consideration, the Commissioners will make suitable recommendations to this effect.

(capitalization in original).

In a March 4, 1939 Memorandum to the Board of Commissioners for the Soldiers' Home, Judge Advocate General, Major General Allen W. Gullion questioned the validity of the perpetual water rights granted to the United States Soldiers' Home by the 1938 Agreement, as follows:

1. By letter, subject as above, dated February 21, 1939, inclosing copy of an agreement dated February 1, 1938, between the Board of Commissioners of the United States Soldiers' Home and the Board of Commissioners of the District of Columbia, together with a copy of a letter from the Governor of the United States Soldiers' Home dated January 26, 1939, and the reply to said letter signed by the President of the Board of Commissioners of the District of Columbia, I am requested to express an opinion on the following questions:

"a. As to the binding effects of the [1938] agreement entered into and as further supported by the two letters hereinbefore referred to.

"b. What further action, if any, the Board of Commissioners of the U.S. Soldiers' Home, should now take to guarantee perpetual water rights to the U.S. Soldiers' Home by the District of Columbia in return for the action of the Board of Commissioners in granting them the right to construct an underground water reservoir on the grounds of the U.S. Soldiers' Home, to improve and enlarge the water system of the District of Columbia.

"c. The desirability or necessity of filing a copy of the agreement and pertinent papers for record in the office of the Recorder of Deeds of the District of Columbia."

2. In substance the agreement gives to the District of Columbia the right to install an underground reservoir on lands constituting a part of the Solders' Home grounds in consideration of the perpetual right to the use of water from the water supply system of the District of Columbia, by the Home without compensation therefor.

3.        (a) In response to question a: Whether the agreement is enforceable in the courts is an extremely doubtful question which can only be resolved by the courts. The agreement is, however, binding on the parties in accordance with its terms. It is, of course, subject to the will of Congress. The subject matter of the agreement is within the exclusive legislative jurisdiction of Congress under Article I, section 8 of the Constitution.

(b) With respect to question b, it is my opinion that there is nothing that can be done by the Board of Commissioners of the Home to guarantee perpetual water rights to the Home by the District of Columbia. The power to tax or charge Government instrumentalities for water does not reside in the Board of Commissioners of the District of Columbia, but in Congress which has not delegated this power. It is suggested that if a bill is introduced in Congress contemplating a tax or charge on water supply, the agreement should be brought to the attention of the Committee to whom the bill is referred. The agreement may have some persuasive effect but as heretofore stated has no binding effect on Congress.

(c) With respect to question c, it is my opinion that it is not necessary to file a copy of the agreement in the Office of the Recorder of Deeds of the District of Columbia. However, such filing will cause the agreement to become a matter of public and permanent record and thus may be influencing in future consideration of water charges to the Home. Accordingly, I deem it desirable that the agreement be so filed.

(capitalization and emphasis in original).

The District of Columbia Public Works Act of 1954

The United States, including the AFRH, had not paid for water or sewer services until the enactment of the 1954 Act. The enactment of the 1954 Act marked the first time that the District's public was charged for sewer services on a recurring basis. As originally enacted, in section 206 of Title II, "Sanitary Sewage Works," the 1954 Act provided that the "Commissioners [of the District of Columbia] are authorized to establish charges for the provision of sanitary sewer service, such charges to be collected in the same manner and at the same time as water charges are collected, and to be paid into the D.C. Sanitary Sewage Works Fund." Id.

The 1954 Act also marked the first time the United States was to be charged for sewer services rendered by the District. The provision in section 212(a) of the 1954 Act, as originally enacted, stated:

The sanitary sewer service charges prescribed herein shall be applicable to all sanitary sewer services furnished by the sanitary sewage works of the District through any connection thereto for direct use by the Government of the United States or any department, independent establishment, or agency thereof, and such charges shall be predicated on the value of water and water services received by such facilities of the Government of the United States or any department, independent establishment, or agency thereof from the District water supply system. Payment of the said sanitary sewer

service charge shall be made as provided in subsection (b) of this section:
*Provided*, That the aggregate amount of such sanitary sewer service charge
for each fiscal year shall be determined in the manner prescribed in section
207 hereof: *Provided further*, That the obligation to pay for sanitary sewer
services received by the Government of the United States or any
department, independent establishment, or agency thereof shall be with
respect to such service furnished on and after July 1, 1954.

Id. § 212(a) (capitalization and emphasis in original). In section 212(b), the 1954 Act
provided:

For the purpose of effectuating the provisions of subsection (a) of this
section there shall be included annually in the budget estimates of the
Commissioners beginning with the estimates for the fiscal year ending June
30, 1955, the value as determined by the Commissioners of the sanitary
sewer service furnished to the United States or to any department,
independent establishment, or agency thereof during the most recent
preceding fiscal year for which such value can be determined based on the
rates for such charges prevailing during the period of such service, and
there shall be appropriated annually for the D.C. Sanitary Sewage Works
Fund out of any money in the Treasury not otherwise appropriated (to be
advanced on July 1 of each fiscal year beginning in July 1, 1954) a sum
corresponding to the said value of charges for sanitary sewer service
furnished the United States.

Id. § 212(b) (capitalization in original). Title II of the 1954 Act was incorporated into the
D.C. Code in what is now D.C. Code § 34-2101, et seq. Neither the AFRH (including any
of its predecessors-in-interest), nor the 1938 Agreement, were mentioned in the 1954 Act.

Relevant to the above-captioned case, in 1989, section 212 of the 1954 Act was
amended and section 212(b) imposed a specific set of instructions on (1) the Secretary
of the Treasury, (2) the District, and (3) each Federal entity receiving sanitary sewer
services from the District before the District was to receive payment from the United
States for sanitary sewer services rendered by the District. As amended in 1989, section
212(b) provided, in full:

(b)(1) Beginning in the second quarter of fiscal year 1990, the government
of the District of Columbia shall receive payment for sanitary sewer services
from funds appropriated or otherwise available to the Federal departments,
independent establishments, or agencies. In accordance with the provisions
of paragraphs (2) and (3) of this subsection, one-fourth (25 percent) of the
annual estimate prepared by the District government shall be paid, not later
than the second day of each fiscal quarter, to the District government by the
Secretary of the Treasury from funds deposited by said departments,
establishments, or agencies in a United States Treasury account entitled
"Federal Payment for Water and Sewer Services." In the absence of

sufficient funds in said account, payment shall be made by the Secretary of the Treasury from funds available to the United States Treasury and shall be reimbursed promptly to the United States Treasury by the respective user agencies. Payments shall be made to the District government by the Secretary of the Treasury without further justification, and shall be equal to one-fourth (25 percent) of the annual estimate prepared by the District government pursuant to paragraph (2) of this subsection.

(2) By April 15 of each calendar year the District shall provide the Office of Management and Budget, for inclusion in the President's budget of the respective Federal departments, independent establishments, or agencies, an estimate of the cost of service for the fiscal year commencing October 1st of the following calendar year. The estimate shall provide the total estimated annual cost of such service and an itemized estimate of such costs by Federal department, independent establishment, or agency. The District's estimates on a yearly basis shall reflect such adjustments as are necessary to (1) account for actual usage variances from the estimated amounts for the fiscal year ending on September 30th of the calendar year preceding April 15th, and (2) reflect changes in rates charged for water and sewer services resulting from public laws or rate covenants pursuant to water and sewer revenue bond sales.

(3) Each Federal department, independent establishment, or agency receiving sanitary sewer services in buildings, establishments, or other places shall pay from funds specifically appropriated or otherwise available to it, quarterly and on the first day of each such fiscal quarter, to an account in the United States Treasury entitled "Federal Payment for Water and Sewer Services" an amount equal to one-fourth (25 percent) of the annual estimate for said services as provided for in paragraph (2) of this subsection.

(4) The amount or time period for late payment of charges for sanitary sewer services involving a building, establishment, or other place owned by the Government of the United States imposed by the District of Columbia shall not be different from those imposed by the District of Columbia on its most favored customer.

District of Columbia Appropriations Act, 1990, Pub. L. No. 101-168, 103 Stat. 1267, 1281–82 (1989) (capitalization in original). As indicated in the quote immediately above, and of particular relevance to the above-captioned case, section 212(b), as amended in 1989, required that the District, "[b]y April 15 of each calendar year, shall provide the Office of Management and Budget, for inclusion in the President's budget of the respective Federal departments, independent establishments, or agencies, an estimate of the cost of service for the fiscal year commencing October 1st of the following calendar year." Id. (emphasis added). The parties refer to this provision of required annual estimates as the Federal Cost of Service Estimates (FCSE). Subsection 212(b)(2) was later amended in 2001 to

require that the District provide its annual FCSE, in addition to the Office of Management and Budget, also to "the Secretary of Treasury, and the head of each of the respective Federal departments, independent establishments, and agencies." See District of Columbia Appropriations Act, 2002, Pub. L. No. 107-96, 115 Stat. 923, 943 (2001). The District of Columbia Appropriations Act of 2002 also added subsection 212(c), which stated:

> Nothing in this section may be construed to require the District of Columbia to seek payment for sanitary sewer services directly from any Federal entity which is under the jurisdiction of a department, independent establishment, or agency which is required to make a payment for such services under this section, or to allocate any amounts charged for such services among the entities which are under the jurisdiction of any such department, independent establishment, or agency. Each Federal department, independent establishment, and agency receiving sanitary sewer services from the District of Columbia shall be responsible for allocating billings for such services among entities under the jurisdiction of the department, establishment, or agency, and shall be responsible for collecting amounts from such entities for any payments made to the District of Columbia under this section.

Id.

Subsequent Correspondence between DCWS and AFRH

As discussed below, the parties have submitted to the court various copies of correspondence between DCWS and the AFRH, beginning in 1990, in which DCWS and the AFRH discuss their respective positions regarding the sewer service charges allegedly owed by the AFRH to DCWS. On June 25, 1990, John Touchstone, then the Director of the District of Columbia Department of Public Works, DCWS' predecessor-in-interest, wrote the following letter to Colonel (Retired) R.W. Hampton, then the Secretary Treasurer of the Soldiers' Home, AFRH's predecessor-in-interest, regarding the validity of the 1938 Agreement and its applicability to sewer services:

> This is in response to your letter of January 10, 1990, addressed to Mr. James E. Dennis, regarding a 1938 Agreement between the District Government and the U.S. Soldiers' and Airmen's Home. We regret the delay in responding to your inquiry. However, it was necessary for us to allow the D.C. Corporation Counsel to review the agreement, prior to accepting or denying the terms outlined.

> The Corporation Counsel recently rendered an opinion on the validity and enforceability of the agreement. As a result of their opinion, the Department of Public Works will honor the 1938 Agreement between the U.S. Solders' and Airmen's Home and the District of Columbia. The District will continue to render water and sewer services to the Home without charge.

(capitalization in original).

In 1996, DCWS, the successor-in-interest to the District of Columbia Department of Public Works, and the plaintiff in this case, was established "to plan, design, construct, operate, maintain, regulate, finance, repair, modernize, and improve water distribution and sewage collection, treatment, and disposal systems and services, and to encourage conservation." Water and Sewer Authority Establishment and Department of Public Works Reorganization Act of 1996, 1995 D.C. Sess. L. Serv. 11–111 (Act 11–201), § 202(c) (1996) (codified as amended at D.C. Code § 34-2202.02(c) (2021)). DCWS was authorized to "establish, adjust, levy, collect, and abate charges for services, facilities, or commodities furnished or supplied by it," D.C. Code § 34-2202.03(11). DCWS was also authorized to "determine whether churches, charitable organizations, or institutions that receive annual appropriations from Congress should be furnished with water or sewer service without charge." D.C. Code § 34-2202.03(31).

The Resolution of the Board of Directors of the D.C. Water and Sewer Authority, which was presented and adopted on December 5, 1996, stated:

In accordance with the Water and Sewer Authority Establishment and Department of Public Works Reorganization Act of 1996, D.C. Law 11-111, sections 203 (31) and 216 (the Act), the District of Columbia members of the Board of Directors considered the matter of furnishing water and sewer services to the United States Soldiers' Home without charge. The Act transferred the responsibility for determining whether any customers are to receive water and sewer services without charge or at reduced rates. Upon consideration, it was decided by a vote of six (6) in favor, and none (0) opposed, and be it resolved as follows:

1) Pursuant to an agreement between the U.S. Soldiers' Home and the District of Columbia, the Commissioners of the Soldiers' Home dated February 1, 1938, granted permission to the District of Columbia to place an underground reservoir on property conveyed in trust to the U.S. Soldiers' Home. As consideration the District of Columbia granted the U.S. Soldiers' Home the perpetual right to use water from the District's water supply system without charge. In a legal review of this agreement, an Assistant D.C. Corporation Counsel and the D.C. Deputy Corporation Counsel for Public Works determined that under the terms of the Agreement, the District is obligated to provide water services to the U.S. Soldier's [sic] Home as long as the District uses the U.S. Soldiers' Home property.

2) The Agreement does not obligate the District of Columbia to provide sewer services without charge to the U.S. Soldiers' Home, and the April 25, 1990 memorandum of the Office of Corporation Counsel concludes that "since the Agreement does not discuss the gratuitous sewer services, the Soldiers' Home may be legally obligated to pay the District for sewer

16

services." However, in a memorandum dated June 19, 1990, the Director of Public Works extended no charge [for] sewer services to the U.S. Soldiers' Home.

3) The Board of Directors wishes to honor the agreement and continue providing water without charge to the U.S. Soldiers' Home. The no charge sewer services practice will be honored for the remainder of fiscal year 1997.

On or before March 1997, the Board will determine whether to extend no charge sewer services into fiscal year 1998. To assist in this determination, the Interim General Manager shall cause a comparative analysis of the annual value of the right to use the U.S. Soldiers' Home property for the reservoir and the value of the no water charge and/or water and sewer services since June 1990. The analysis should be submitted for consideration by the Retail Rates Committee at its February 1997 meeting.

(capitalization in original).

In a letter dated January 12, 2004, the Chief Financial Officer of DCWS, Mr. Paul Bender, wrote to the Facilities Manager of the Soldiers' Home, stating:

The U.S. Soldiers' and Airmen's Home ("Soldiers' Home") receives free water service from the District of Columbia Water and Sewer Authority (WASA) for eight accounts pursuant to an agreement executed in 1928 [sic] between the District of Columbia and the Soldier's Home

WASA, and before October 1996 the District of Columbia Government, has also provided the Soldier's Home sewer service at no charge even though sewer service is not part of the agreement. In 1996, the WASA Board of Directors reviewed the agreement with Soldier's Home and determined that the sewer exemptions should be eliminated; this was part of an overall elimination of all other free services that were then being provided by the D.C. Government, including free water and sewer service to the District of Columbia Government itself.

Therefore, effective July 1, 2004, WASA will begin to bill Soldier's Home for sewer service for all of its accounts. The institution of sewer fees is also consistent with federal law; fee exemptions of sewer services conflict with Section 204(b)(1) of the Clean Water Act (PL 92-500). Federal regulations require elimination of any contract that contravenes this section of the law.

Free water service for the eight accounts will continue for the time being. WASA desires to open discussion with Soldier's Home regarding the continuation of free water service and the value already provided to the Home compared to the value of the property. We also need to resolve with

you the historical unbilled amounts for sewer service.

Soldiers' Home eight exempt accounts registered 70,000 hundred cubic feet (ccf) of use from October 2002 to September 2003. WASA's wastewater rate is $2.57 per ccf. We estimate the annual cost of sewer service to these eight accounts to be approximately $180,000. WASA understands this amount may impose a financial burden on the Soldier's Home and we welcome your thoughts on how to mitigate this impact.

I would like to meet with you to develop a mutually agreeable plan to implement sewer charges for these accounts and resolve these issues. I will contact you to arrange a meeting.

(capitalization in original).

Based on the record before the court, including the supplemental submissions filed by both parties, it appears that DCWS did not attempt to charge the AFRH for sewer services rendered until at least 2004. Plaintiff alleges that "[b]eginning in 2004, and at regular, [sic] intervals since," DCWS "has billed AFRH for sewer services provided which includes impervious area charges." Although plaintiff has produced a number of spreadsheets and tables documenting charges for various sewer services rendered by the DCWS to the AFRH, plaintiff has produced little evidence that it had sent billings for such sewer services to the AFRH at "regular intervals" since 2004. There are only two actual "billings" which have been produced in the record before the court, even after multiple instructions to the parties to file fuller and more complete documentation if available. One billing is a "Bill Summary," dated March 9, 2012, indicating a bill amount to the AFRH for $1,794,808.89, of which $1,744,174.48 is indicated as past due. The second billing is a "Group Bill Summary," dated May 25, 2018, which indicates a total amount due by the AFRH of $12,472,946.91, of which $12,452,520.54 is indicated as past due. Plaintiff also states in supplemental briefing:

Beginning in October 2007, DC Water's electronic data system records reflect billings for sewer services being sent to:

Soldiers' Home,
ACCTG OPS/UNB Building 5th FL,
Bureau of Public Debt/PO BOX 1328,
Parkersburg, WV 26106

(hereinafter referred to as the "West Virginia AFRH business address").

(capitalization in original).[3]

---

[3] Although plaintiff alleges that "billings were sent to" the above West Virginia address, plaintiff has not produced any billings sent to that address, including the two billings discussed above, for the record before the court.

Based on the record before the court, DCWS retained a consultant company, PB Consult, and, in a July 16, 2004 memorandum from David Earley of PB Consult to Paul Bender, Chief Financial Officer of DCWS, Thomas Bridenbaugh of Leftwich & Ludaway, LLC, Nick Amrhein of PB Consult, and John Cromwell of Stratus Consulting, Mr. Earley estimated that "[c]umulatively, the Soldiers Home has received $13.3 million in water and sewer services over the 65 year period."

The court notes that, according to plaintiff, in 2010, DCWS and the AFRH began another negotiation to "construct a five-million-gallon reservoir" on AFRH's premises. A January 20, 2011 email from Jessica Demoise of the DCWS Department of Engineering and Technical Services, to Jody Russell of the AFRH provided, in relevant part:

> This email summarizes our meeting today, January 20th, with Soldiers Home regarding the feasibility of locating a 5MG tank on their property.
>
> We met with Justin Seffens, Chief of Campus Operations, and Steve McManus, Acting GM and Deputy COO/CFO. They stated that AFRH is open to the idea of locating the tank at the Eisenhower Drive site, and requested that the design include a garden on top of the tank. A condition of AFRH's cooperation is that DC Water must renew the agreement to provide water service on a perpetual basis. (It should be noted that AFRH believes that their sewer is also currently subsidized.)

(capitalization in original).

In a February 2, 2011 email from Olu Adebo, Chief Financial Officer of DCWS, to Steven McManus of the AFRH, Mr. Adebo wrote:

> I am reaching out to you and your team to find out how we can resolve a long standing financial dispute between our 2 agencies. As you may already be aware, Soldiers Home currently owes over $4m in unpaid sewer charges on its sewer account. In addition, while we wish to continue to honor the current agreement for providing free water (this agreement does not obligate the Water Authority to provide free sewer), due to the extensive passage of time since the agreement was struck, we will like to discuss and clarify certain aspects of the agreement.
>
> Note that although, we started to bill your agency for sewer services in 2004, to date, we have not received any payment or formal notification explaining your lack of payment. Also, note that between 1996 and 2004 we made numerous attempts to understand the basis for an exemption to your agency for sewer services, however, to date, no one has been able to substantiate the basis for the exemption. Our suspicion is that the

exemption stems from an old tradition (that has long since changed) of providing free water and sewer to government and non-profit type organizations in the District. Note that after 1996 through legislation and rulemaking in the District this exemption was cancelled for all entities and every customer now pays for services provided.

While we concede that an existing agreement obligates us to provide free water, we however see no basis, or know of any basis (in light of our current legislative structure), for not charging for sewer services on your accounts. As I stated above, the outstanding balance now exceeds $4m and has risen to the attention of our board of directors who have identified this as a critical issue that has to be dealt with this fiscal year. Coincidentally, we are also interested in discussing with you an option to build additional water facility on your premises, which could create an opportunity to discuss and negotiate these matters.

I have been tasked by our General Manager and Board to coordinate a resolution to this matter. Please confirm that you are the appropriate officer in your organization to work with directly on this matter, and if so when we can reasonable [sic] expect to get together "soon" to discuss. If you are not the appropriate officer please direct me to the correct party. I look forward to a productive dialogue and a timely resolution to this matter.

(capitalization in original). On February 3, 2011, Mr. McManus of the AFRH responded:

Mr. Adebo, Thank you for your note. As the agency head, I'm probably the best person to start with. Please see attached memo from DC Public Works dated June 25, 1990. Based on this letter I'm not sure it is correct to use the terminology – "long standing financial dispute between our 2 agencies." Also believe it is important to understand and point out that our 1938 agreement that was validated in 1990 by the DC Corporation Counsel was the result of DC placing a large water reservoir on the AFRH-W Campus and not because we were government or a non-profit. We look forward to discussing the mutual benefits of DC building an additional water facility on AFRH. We are in the process of moving real property support from GSA to DoD. Would expect this to take another 30 to 60 days. Once this realignment has occurred we will reach out for discussions. Is that timeline acceptable to you?

Mr. Adebo responded the same day, February 3, 2011, writing:

Thanks for your timely response on this matter. I will appreciate if we can meet within the next two weeks to clarify the facts around our current arrangement. If that works I will send you some tentative dates for such a meeting.

The long standing dispute I referenced was related to the sewer bills and not water. I expect that this meeting I requested would set the stage for our negotiation meetings in the very near future.

Finally, also on February 3, 2011, Mr. McManus responded: "Mr. Adebo, Understand, but the letter dated June 25, 1990 by DC validated both water and sewer. I will be in Gulfport, MS all next week. You are welcome to propose some dates the following week." No further communications between Mr. Adebo and Mr. McManus are included in the record before the court.

In a supplemental brief, plaintiff asserts:

Between 2012 and 2017, negotiating teams from AFRH and DC Water met to discuss AFRH's payment for water and sewer services regarding the following issues: whether the residential properties that AFRH rented should receive free water services, whether there should be a cap on free water services to encourage conservation, whether the 1938 Agreement exempted AFRH from payment for sewer, whether the meters were accurately recording water consumption necessary for sewer billing, whether all accounts were active, whether there was any objection to DC Water's statement of amounts due, defining core (essential to AFRH's mission) and non-core properties and buildings for services, whether an agreement could be reached for a valuation of the past consumption of water in order to agree on an amount for the past sewer services and a time frame for payment for the past, ongoing and future services.

Throughout this litigation the parties have provided little documentation of the negotiations between the parties between 2012 and 2017 or copies of billing statements from the DCWS to the AFRH, even after multiple requests from the court for more evidence of comprehensive communications or documentation. The record before the court does include a May 7, 2012 letter from Justin Seffens, Chief of Campus Operations of the AFRH, to Jacqueline Brown-Ervin, a Commercial Care Associate of DCWS, stating:

The Armed Forces Retirement Home disputes the three (3) Billings, sent by FedEx dated May 1, 2012 to this facility because we are <u>exempt from charges</u> pursuant to a longstanding Agreement between the Armed Forces Retirement Home and the District of Columbia Water and Sewer Authority, whereby, in 1939 [sic], the District of Columbia agreed to exempt the Armed Forces Retirement Home. The Armed Forces Retirement Home and DC Water are currently negotiating a resolution to this dispute, and until this dispute is resolved, the Armed Forces Retirement Home shall continue to officially dispute all billing charges.

(capitalization and emphasis in original). As discussed above, there are only two billing records which were provided for inclusion in in the record before the court: one in March of 2012, and one in May of 2018. It is, therefore, unclear as to which "three (3) Billings,

sent by FedEx dated May 1, 2012," mentioned in the quote immediately above, Mr. Seffens of the AFRH is referring. Plaintiff also alleges that "DC Water and AFRH entered into a Tolling Agreement to stay the running of the District of Columbia's three – year statute of limitations while exploring efforts to resolve the impasse over the payment for sewer services," starting on January 22, 2013, and that the "January 2013 Tolling Agreement was thereafter renewed every six months until January 10, 2017 when the term of the agreement was set for one-year to expire on January 9, 2018." Plaintiff states that "[i]n December 2017, Joseph H. Pollard, AFRH's General Counsel, advised DC Water that AFRH would not extend the tolling agreement beyond its January 8th [2018] expiration." In its supplemental submissions to the court, plaintiff provided a January 22, 2013 Tolling Agreement, as well as a January 10, 2017 extension, but did not produce any record of the extensions in between or beyond those dates.

DCWS' Annual Federal Cost of Service Estimate Submission

Plaintiff concedes that "[p]rior to April 15, 2019, DC Water did not include the AFRH in the annual FCSE submitted to the Office of Management and Budget, the United States Treasury and the Department of Defense official responsible for AFRH." The record before the court contains an April 13, 2021 affidavit from Carolyn Mackool, who attested that "[s]ince 2017" she has "been the Director of Customer Care for the District of Columbia Water and Sewer Authority," and that among her duties are to "supervise accounting and billing services to customers, including federal departments, agencies, and independent establishments of the United States Government." Additionally, Ms. Mackool attested that "[u]ntil January 2019, DC Water treated AFRH as a commercial account, exempted from paying for drinking water, billed on a retrospective pay as you go basis." She further attested that "[a]t least once every year, on or about April 15th, DC Water provides the United States its estimate of the cost of service for the upcoming fiscal year for each of the United States' agencies, federal departments, and independent establishments." Ms. Mackool further attested that up until 2019, DCWS "had not included the sewer services provided to AFRH as part of the Federal Cost of Service Estimate (FCSE) for any fiscal year," but that "[i]n January 2019, the Department of Customer Services became aware that AFRH was a federal entity and should be included in the federal estimate." Ms. Mackool further attested that DCWS then "prepared a summary of the costs of sewer services provided to AFRH from FY2010 through FY2017," which "were thought to be those for which we could legally recover costs." She further indicated that, on January 23, 2019, DCWS "provided this summary of sewer services costs to the U.S. Treasury as a true-up for sewer services provided to the AFRH and requested payment for those services," but that DCWS's "request was denied."[4]

In the record before the court, plaintiff produced a ten-page set of spreadsheets which appear to be what plaintiff and Ms. Mackool refer to as the "true-up" provided to the United States Treasury on January 23, 2019 for sewer services and impervious area

---

[4] In a footnote to Ms. Mackool's April 13, 2021 affidavit, she explained that her "best recollection is the denial was communicated in a telephone conversation to members of my staff from the Treasury officials with whom they had been communicating."

charges allegedly incurred by the AFRH. The January 23, 2019 "true-up" is specific to the AFRH, and is a separate document from the FCSE's submitted later in 2019, which are discussed below. The first spreadsheet of the January 23, 2019 "true-up" is titled: "**FY2020 Federal Billing Estimate & FY2017 True-up (For Agencies Appropriations)**." (capitalization and emphasis in original). For the first eight pages of the spreadsheet, the years listed in the title of each page decreases one fiscal year from the previous page, with the eighth page titled: "**FY2013 Federal Billing Estimate & FY2010 True-up (For Agencies Appropriations)**." (capitalization and emphasis in original). In each of the first eight pages, for each of the fiscal years for federal billing estimate and true-up indicated in the title, there are columns named: "**Estimated Amount Billed**," "**Actual Usage Cost**," and "**Adjustment for** . . . **Actual Usage Variance**," and are associated with the following five categories of fees: "**WSRF** [Water System Replacement Fee]," "**METERING FEE**," "**CLEAN RIVERS IAC** [Impervious Area Charge (CRIAC)]," "**STORMWATER**," and "**RIGHT-OF-WAY FEE.**" (capitalization and emphasis in original). Almost all of the amounts in the "**Estimated Amount Billed**" columns, however, are left empty, and all of the amounts in the "**Actual Usage Cost**" columns are identical to the amounts in the "**Adjusted for** . . . **Actual Usage Variance**" columns. (emphasis in original). For example, the following WSRF and metering fees are listed in the first spreadsheet page, which is titled: "**FY2020 Federal Billing Estimate & FY2017 True-up (For Agencies Appropriations)**:"

| | | | WSRF | | | | METERING FEE | | |
| | | FY2020 | | FY2017 | | | | FY2017 | |
| Account Number | FY 2020 Estimated W/S Only Amount | TOTAL FY 2020 WSRF Estimated Amount | Estimated Amount Billed for FY 2017 Usage | Actual Usage Cost for FY 2017 | Adjustment for FY 2017 Actual Usage Variance | TOTAL FY 2020 Metering Fee Estimated Amount | Estimated Amount Billed for FY 2017 Usage | Actual Usage Cost for FY 2017 | Adjustment for FY 2017 Actual Usage Variance |
|---|---|---|---|---|---|---|---|---|---|
| 78282 | | | - | 83,940.94 | 83,940.94 | | | 4,910.71 | 4,910.71 |
| 78284 | | | | 23,871.64 | 23,871.64 | | | 3,879.48 | 3,879.48 |
| 201063 | | | | 1,052.46 | 1,052.46 | | | 89.22 | 89.22 |
| | - | - | - | 108,865.04 | 108,865.04 | - | - | 8,879.41 | 8,879.41 |

The ninth page of the spreadsheet lists the same categories of fees, but focuses on "**Pre FY2010 Past Due Amount**[s]." (capitalization and emphasis in original). The tenth page appears to contain the sum of all previous costs from the document, and lists a final "**Total Past Due**" for the charges in the amount of $10,637,264.10 (capitalization and emphasis in original).

As explained in the April 13, 2021 affidavit of Ms. Mackool, "[o]n or about April 18, 2019, DC Water submitted its FCSE" for the fiscal year 2021, "to the United States Office of Management and Budget, U.S. Treasury and appropriate officials of federal agencies, departments, and independent establishments of the United States, including AFRH, included in the FCSE." Ms. Mackool further attested that "[o]n July 16, 2019, DC Water submitted a revised estimate for FY2021 to correct certain formulaic errors that affected all of DC Water's calculations throughout the estimate." Plaintiff has produced both the initial 2019 FCSE, dated April 15, 2019, as well as the revised, July 16, 2019 submission, both of which are for the fiscal year 2021.[5] Both the April 15, 2019 FCSE and the revised,

---

[5] Plaintiff's submissions also include another affidavit from Carolyn Mackool, dated December 18, 2019, in which Ms. Mackool attested that the "[o]n or about April 18, 2019" FCSE submission was for the 2022 fiscal year, not for the 2021 fiscal year. That the April 15, 2019 FCSE, or revised July 16, 2019 FCSE, provided estimates for the 2022 fiscal

July 16, 2019 FCSE include a cover letter, which states, as taken from the July 16, 2019 version:[6]

> This letter serves to formally transmit a revision of the FY 2021 water and sewer bill for all federal agencies served by the District of Columbia Water and Sewer Authority (DC Water). We reviewed the previously issued Federal Cost of Service Estimate for FY2021 and identified some errors, including the incorrect version of Exhibit V. In addition, there were some incorrect formulas in Exhibit I. These errors have caused some confusion and we are reissuing the Cost of Service Estimate for FY2021 with the appropriate corrections. In the interest of improving our process, minimizing our risk for data link errors, and providing less redundant information, we reduced the FY2021 estimate from eleven exhibits to four. This decision was made in conjunction with the Department of Treasury and our legal counsel. It is our sincerest hope you find this document easier to understand and identify the responsibility of each respective agency.

> As detailed further in the enclosed documents, the total water and sewer bill for all federal agencies is approximately $101,518,263.58. This bill is net of the FY 2018 actual settlement as required by federal law and as further explained below.

> This bill constitutes the basis for appropriation of FY 2021 federal payment for all services furnished by DC Water in accordance with the DC Public Works Act of 1954, as amended, and Public Laws 103-334, 107-96 and 108-335. The enclosed detail exhibits accommodate the change to the legislation, Public Law 111-378, that clarifies federal responsibility for payment of storm water charges and restricts payment of such storm water charges from permanent appropriation of the U.S. Treasury. As a result, the enclosed bill delineates the portion of the appropriation that will be paid from the U.S. Treasury permanent authorization account and the remaining balance that will be paid directly from each federal agency account. The total amount remains the sum of the appropriation required for each agency.

---

year is in contradiction to the information transmitted either by the original or the revised 2019 FCSE, both of which state that the estimates pertained to fiscal year 2021. Adding further confusion, plaintiff's amended complaint states that the "[o]n or about April 18, 2019" FCSE submission was for estimates pertaining to "the upcoming fiscal year," which neither would be for the 2022 or for the 2021 fiscal year, but for the 2020 fiscal year. In supplemental briefing to the court, plaintiff states that its references to the 2019 submissions of its FCSE were for the 2021 fiscal year.

[6] Aside from the first paragraph added to the cover letter of the July 16, 2019 revised FCSE, which explains the need for the revision, the July 16, 2019 FCSE cover letter is substantially similar to the April 15, 2019 FCSE cover letter.

> Each agency is required to pay the IPAC[7] request they receive from the Department of Treasury. In the event an agency disputes what is owed, they should contact the designated billing agent. If adjustments are warranted, we will correct individual accounts and the outcome will be reflected on the true-up for the agency. As in previous years, we have included detailed information, by federal agency and meter, for your reference, and consistent with federal law, are transmitting a copy of this estimate to all federal agencies (see enclosed distribution list).

(capitalization in original). Notably, the July 16, 2019 FCSE lists as a "[k]ey assumption[] for the FY 2021 billing," that "[t]his year's adjustment includes billing from 2012 to 2018 for Department of Defense- AFRH in the amount of $7.5 million." Enclosed with the July 16, 2019 transmission letter is an exhibit which lists the "**FY2021 Net Federal Bill Payment (For Agencies Appropriations)**," and provides, with respect to the AFRH, that the AFRH's "**Total FY2021 Estimate**" equals $1,747,090.49; that the AFRH's "**FY18 True-Up**," which, based on the "[k]ey assumption" described in the July 16, 2019 letter, includes "billing" to the AFRH from 2012 to 2018, equals $7,487,138.27; that the "**Total $ FY2021 Bill Amount**," which is the previous two amounts added together, equals $9,234,228.76, and of that amount, $648,299.31 is for stormwater charges; and that the "**US Treasury Total $ FY2021 Bill**" for the AFRH, which is equal to the "**Total $ FY2021 Bill Amount**" for the AFRH, less AFRH's stormwater fees, is calculated as $8,585,929.45. (capitalization and emphasis in original).

## DISCUSSION

This case was originally filed in the United States District Court for the District of Columbia on January 9, 2018, and subsequently transferred from the United States District Court for the District of Columbia to the United States Court of Federal Claims in October 2018. In this court, the case was originally assigned to Judge Thomas C. Wheeler. The case was stayed to allow for plaintiff to submit its 2019 FCSE for the 2021 fiscal year. Once plaintiff had submitted its estimate for the 2021 fiscal year, plaintiff filed an amended complaint containing four counts. The parties subsequently stipulated to dismiss the first two counts. Plaintiff's remaining two counts allege a violation of the 1954 Act, which plaintiff argues created a statutory obligation for the AFRH to make payments for sewer services rendered by the District, and alleges a claim for quantum meruit and that AFRH has received valuable sewer services from DCWS without payment.

After the amended complaint was filed, defendant initially filed a motion to dismiss pursuant to RCFC 12(b)(1) or RCFC 12(b)(6). With respect to the motion to dismiss pursuant to RCFC 12(b)(6), defendant argues that plaintiff's amended complaint fails to state a claim because the 1938 Agreement must be read to prevent DCWS from charging the AFRH for sewer services. Defendant argues that: (1) the 1938 Agreement was "unambiguous" and included sewer services free of charge to the AFRH; (2) the laws in

---

[7] Although not defined in the revised July 16, 2019 FCSE, IGPC appears to be an acronym for "Intra-Governmental Payment and Collection."

effect at the time of the 1938 Agreement treat water and sewer services similarly; (3) plaintiff's predecessor-in-interest acknowledged that the 1938 Agreement encompassed sewer services; and (4) plaintiff's inaction in attempting to charge AFRH for sewer services until 2004 constitutes a waiver of plaintiff's right to now bring suit for payments plaintiff might have attempted to start recovering as early as 1954. Defendant also alternatively argues, pursuant to RCFC 12(b)(1), that plaintiff lacks jurisdiction to bring all but one year of plaintiff's claims for recovery of payments allegedly due, because "[t]he District does not allege proper submission of <u>any</u> AFRH sewer charges until April 2019." (emphasis in original). As discussed above, plaintiff alleges in its amended complaint that it has billed the AFRH "at regular intervals" since 2004, but, until 2019, had not ever included the AFRH in its annual submission of its FCSE.[8] Defendant excludes from its RCFC 12(b)(1) jurisdictional motion, plaintiff's claim for the recovery of such funds related to its April 2019 submission of estimates as they pertain to the 2021 fiscal year, but argues that recovery of such funds nevertheless fails for the reasons discussed in its RCFC 12(b)(6) motion. Defendant also argues that plaintiff lacks jurisdiction to the extent it seeks to recover impervious area charges, because the 1954 Act, as amended, does not waive sovereign immunity for such charges. After the parties completed briefing on defendant's motion to dismiss, the parties brought cross-motions for summary judgment which generally tracked the parties' arguments addressed in the briefing for the motions to dismiss. The above captioned case was first transferred to another Judge of this court before ultimately being assigned to the undersigned for resolution during the summary judgment briefing. After oral argument on the motions to dismiss and for summary judgment, the court ordered the parties to submit supplemental briefings to explain their respective positions on the interplay between the 1954 Act and the 1938 Agreement, as well as to give the parties an opportunity to supplement the record with additional relevant, but apparently missing, documents. In defendant's supplemental briefing, defendant continues to maintain that plaintiff is not entitled to payment for sewer services rendered because of the 1938 Agreement in which the District, according to defendant, agreed to provide sewer services, in addition to water services, to AFRH's predecessor-in-interest

---

[8] In supplemental briefing to the court, plaintiff stated:

> On April 15, 2020, DC Water submitted its FCSE for FY2022 to the federal government for federal entities including the AFRH. The FY2022 for AFRH includes a True-up for FY 2019 of the actual charges incurred in FY2019 although there was not a prior estimate for the fiscal year charges. On April 15, 2021, DC Water will submit its FCSE for FY2023. This estimate will have a True-up for of [sic] the actual charges incurred in providing sewer services to the AFRH in FY2020 although there was not a prior estimate for the fiscal year charges. The methodology for estimating the cost of services and True-up are the same for each fiscal year and consistent with DC Water's treatment of other federal customers.

(capitalization in original). The court also notes that plaintiff also requests in its supplemental briefing that the undersigned issue "an Order approving the methodology for calculating the Federal Cost of Service Estimates for FY2022 and FY2023."

free of charge and in perpetuity in exchange for the permission to build a water distribution reservoir on the property on which the AFRH is situated. Although the defendant does not dispute that the 1954 Act generally obligates the United States and its federal entities situated in the District to pay for sewer services rendered by the District, defendant argues that the obligation does not apply to the AFRH.

Defendant also does not dispute the general authority of Congress to obligate the United States to pay for sewer services rendered to the AFRH by the District, or the authority of Congress to effectively nullify the 1938 Agreement through the passage of legislation. Defendant argues, however, that "any interpretation of the 1954 Act must necessarily account for the 1938 agreement," and, thus, an exception for the AFRH must be read into the 1954 Act and its subsequent amendments, such that the AFRH is to be excluded from the general mandate that federal entities are to compensate the District for sewer services rendered. Defendant argues that congressional intent to uphold the AFRH's rights gained from the 1938 Agreement is evidenced by the 1954 Act's failure to explicitly "disband the parties' earlier 1938 Agreement if it wished to eliminate its [the 1938 Agreement's] protections." Defendant argues that "harmony" between the 1938 Agreement and the 1954 Act "is further supported by the fact that both parties' behavior shows that they understood Congress did not intend to obviate the parties' 1938 agreement." Defendant also argues that it would achieve an "absurd result" if the 1954 Act, which, in addition to section 212, mandates, in a similar, but separate, provision, federal entities to pay for water services, as it does for sewer services, were to be read to nullify the 1938 Agreement in its entirety, because such an interpretation would also eliminate AFRH's right to free water services, which, the parties do not dispute, was agreed to in the 1938 Agreement. Such nullification of the 1938 Agreement, defendant argues, would "result in an illusory agreement wherein AFRH gets no benefit, and resultantly, the District had no right to its easement in the first place." In plaintiff's supplemental briefing, plaintiff maintains that the 1938 Agreement did not include sewer services free of charge and in perpetuity, but that even if the 1938 Agreement did, Congress exercised its authority through the enactment of the 1954 Act and subsequent amendments thereto to obligate all federal entities, including the AFRH, to pay for sewer services rendered.

Construction and Operation of Section 212 of the 1954 Act, as Currently Amended

The amended provisions of section 212 of the 1954 Act are incorporated into the D.C. Code at § 34-2112, titled: "Sanitary sewer service charges for United States government." Section 212, in its entirety, as currently amended, reads:

**(a)** The sanitary sewer service charges prescribed herein shall be applicable to all sanitary sewer services furnished by the sanitary sewage works of the District through any connection thereto for direct use by the government of the United States or any department, independent establishment, or agency thereof, and such charges shall be predicated on the value of water and water services received by such facilities of the government of the United States or any department, independent establishment, or agency thereof from the District water supply system.

Payment of the said sanitary sewer service charge shall be made as provided in subsection (b) of this section.

**(b)(1)** Beginning in the second quarter of fiscal year 1990, the government of the District of Columbia shall receive payment for sanitary sewer services from funds appropriated or otherwise available to the Federal departments, independent establishments, or agencies. In accordance with the provisions of paragraphs (2) and (3) of this subsection, one-fourth (25 percent) of the annual estimate prepared by the District government shall be paid, not later than the second day of each fiscal quarter, to the District government by the Secretary of the Treasury from funds deposited by said departments, establishments, or agencies in a United States Treasury account entitled "Federal Payment for Water and Sewer Services". In the absence of sufficient funds in said account, payment shall be made by the Secretary of the Treasury from funds available to the [United States Treasury and shall be reimbursed promptly to the United States Treasury by the][9] respective user agencies. Payments shall be made to the District government by the Secretary of the Treasury without further justification, and shall be equal to one-fourth (25 percent) of the annual estimate prepared by the District government pursuant to paragraph (2) of this subsection.

> **(2)** by April 15 of each calendar year the District shall provide the Office of Management and Budget, the Secretary of the Treasury, and the head of each of the respective Federal departments, independent establishments, and agencies, for inclusion in the President's budget of the respective Federal departments, independent establishments, or agencies, an estimate of the cost of service for the fiscal year commencing October 1st of the following calendar year. The estimate shall provide the total estimated annual cost of such service and an itemized estimate of such costs by Federal department, independent establishment, or agency. The District's estimates on a yearly basis shall reflect such adjustments as are necessary to (A) account for actual usage variances from the estimated amounts for the fiscal year ending on September 30th of the calendar year preceding April 15th, and (B) reflect changes in rates charged for water and sewer

---

[9] The Consolidated Appropriations Act for FY2001 amended section 212(b) of the 1954 Act as follows, "in the third sentence of paragraph (1), by striking 'United States Treasury and' and all that follows through 'by the.'" The versions of section 212 which are published on Westlaw, Lexis Nexis, Bloomberg Law, and the D.C. Code website do not strike this language, and there are no subsequent amendments to section 212 in which such language is reincluded. The parties, in a joint supplemental submission in response to the court's inquiry, confirmed an error in the D.C. Code, contrary to the citations on Westlaw, Lexis Nexis, Bloomberg Law, and the D.C. Code website.

services resulting from public laws or rate covenants pursuant to water and sewer revenue bond sales.

**(3)** Each Federal department, independent establishment, or agency receiving sanitary sewer services in buildings, establishments, or other places shall pay from funds specifically appropriated or otherwise available to it, quarterly and on the first day of each such fiscal quarter, to an account in the United States Treasury entitled "Federal Payment for Water and Sewer Services" an amount equal to one-fourth (25 percent) of the annual estimate for said services as provided for in paragraph (2) of this subsection.

**(4)** The amount or time period for late payment of charges for sanitary sewer services involving a building, establishment, or other place owned by the Government of the United States imposed by the District of Columbia shall not be different from those imposed by the District of Columbia on its most favored customer.

**(5)** Repealed.

**(c)** Nothing in this section may be construed to require the District of Columbia to seek payment for sanitary sewer services directly from any Federal entity which is under the jurisdiction of a department, independent establishment, or agency which is required to make a payment for such services under this section, or to allocate any amounts charged for such services among the entities which are under the jurisdiction of any such department, independent establishment, or agency. Each Federal department, independent establishment, and agency receiving sanitary sewer services from the District of Columbia shall be responsible for allocating billings for such services among entities under the jurisdiction of the department, establishment, or agency, and shall be responsible for collecting amounts from such entities for any payments made to the District of Columbia under this section.

D.C. Code § 34-2112 (capitalization and emphasis in original) (brackets and strike-out represent words which were struck by the Consolidated Appropriations Act for FY2001).

In order to reach a decision in the above-captioned case, the court must interpret section 212 of the 1954 Act. In a statutory construction analysis, the first step is "to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)); see also Republic of Sudan v. Harrison, 139 S. Ct. 1048, 1056 (2019) (quoting Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 566 U.S. 399, 412 (2012) ("We begin 'where all such inquiries must begin: with the language of the statute itself.'" (quoting United States v.

Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989)))); Jimenez v. Quarterman, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); Facebook, Inc. v. Windy City Innovations, LLC, 973 F.3d 1321, 1330 (Fed. Cir. 2020) ("Our 'first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."'" (quoting Barnhart v. Sigmon Coal Co., Inc., 534 U.S. at 450 (quoting Robinson v. Shell Oil Co., 519 U.S. at 340))); Starry Assocs., Inc. v. United States, 892 F.3d 1372, 1377 (Fed. Cir. 2018) Click-To-Call Techs., LP v. Ingenio, Inc., YellowPages.com, LLC, 899 F.3d 1321, 1329 (Fed. Cir. 2018); Starry Assocs., Inc. v. United States, 892 F.3d 1372, 1377 (Fed. Cir. 2018); Bettcher Indus., Inc. v. Bunzl USA, Inc., 661 F.3d 629, 644 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2011); Strategic Hous. Fin. Corp. of Travis Cnty. v. United States, 608 F.3d 1317, 1323 (Fed. Cir.) ("When interpreting any statute, we look first to the statutory language."), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 562 U.S. 1221 (2011). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. at 341 (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477 (1992); McCarthy v. Bronson, 500 U.S. 136, 139 (1991); see also King v. Burwell, 576 U.S. 473, 474 (2015) ("[W]hen deciding whether the language is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'" (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000)). In construing a statute, courts "'must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" Schindler Elevator Corp. v. United States, 563 U.S. 401, 407 (2011) (2011) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 175 (2009) (internal quotation marks omitted)). Even "'[w]hen terms used in a statute are undefined, we give them their ordinary meaning.'" Schindler Elevator Corp. v. United States, 563 U.S. at 407 (quoting Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995)). "'Beyond the statute's text, the traditional tools of statutory construction include the statute's structure, canons of statutory construction, and legislative history.'" Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States, 617 F.3d 1357, 1361 (Fed. Cir.) (quoting Bull v. United States, 479 F.3d 1365, 1376 (Fed. Cir. 2007)), reh'g en banc denied (Fed. Cir. 2010); see also Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 566 U.S. at 412 ("[W]e consider each question [of statutory interpretation] in the context of the entire statute." (citing Robinson v. Shell Oil Co., 519 U.S. at 341)); Roberts v. Sea-Land Servs., Inc., 566 U.S. 93, 100 (2012); Bush v. United States, 655 F.3d 1323, 1329 (Fed. Cir. 2011), cert. denied, 566 U.S. 1021 (2012).

The initial inquiry into the statutory text ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" Barnhart v. Sigmon Coal Co., 534 U.S. at 450 (quoting Robinson v. Shell Oil Co., 519 U.S. at 340); see also King v. Burwell, 576 U.S. at 474 ("If the statutory language is plain, we must enforce it according to its terms." (citing Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 251 (2010)); Sucic v. Wilkie, 921 F.3d 1095, 1098 (Fed. Cir. 2019) (quoting Barnhart v. Sigmon Coal Co., 534 U.S. at 450); Bettcher Indus., Inc. v. Bunzl USA, Inc., 661 F.3d at 644; Arko Foods Int'l, Inc. v. United States, 654 F.3d 1361, 1364 (Fed. Cir. 2011) ("'[W]here Congress has clearly stated its intent in the language of a statute, a court

should not inquire further into the meaning of the statute.'" (quoting <u>Millenium Lumber Distrib., Ltd. v. United States</u>, 558 F.3d 1326, 1328 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2009)); <u>Am. Airlines, Inc. v. United States</u>, 551 F.3d 1294, 1300 (Fed. Cir. 2008). Thus, when the "'statute's language is plain, "the sole function of the courts is to enforce it according to its terms."'" <u>Johnson v. United States</u>, 529 U.S. 694, 723 (2000) (quoting <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. at 241 (quoting <u>Caminetti v. United States</u>, 242 U.S. 470, 485 (1917))); <u>see also</u> <u>Jimenez v. Quarterman</u>, 555 U.S. at 118; <u>Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.</u>, 530 U.S. 1, 6 (2000)); <u>Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States</u>, 617 F.3d at 1361 (citing <u>Sharp v. United States</u>, 580 F.3d at 1237); <u>Candle Corp. of Am. v. U.S. Int'l Trade Comm'n</u>, 374 F.3d 1087, 1093 (Fed. Cir.), <u>reh'g</u> and <u>reh'g denied</u> (Fed. Cir. 2004).

In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. <u>See</u> <u>Setser v. United States</u>, 566 U.S. 231, 239 (2012) ("Our decision today follows the interpretive rule they invoke, that we must 'give effect . . . to every clause and word' of the Act." (omission in original) (quoting <u>United States v. Menasche</u>, 348 U.S. 528, 538–39 (1955))); <u>see also</u> <u>Alaska Dep't of Env't Conservation v. EPA</u>, 540 U.S. 461, 489 n.13 (2004) ("It is, moreover, "'a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or otherwise insignificant."'" (quoting <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001) (quoting <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001)))); <u>Williams v. Taylor</u>, 529 U.S. 362, 404 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible); <u>Boeing Co. v. Sec'y of the Air Force</u>, 983 F.3d 1321, 1327 (Fed. Cir. 2020) (quoting <u>Shea v. United States</u>, 976 F.3d 1292, 1300 (Fed. Cir. 2020) ("[i]t is a 'cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute.'" (quoting <u>Williams v. Taylor</u>, 529 U.S. at 364))); <u>Sharp v. United States</u>, 580 F.3d 1234, 1238 (Fed. Cir. 2009). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. <u>See</u> <u>Duncan v. Walker</u>, 533 U.S. at 174 (noting that courts should not treat statutory terms as "surplusage"). "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." <u>Radzanower v. Touche Ross & Co.</u>, 426 U.S. 148, 155 (1976); <u>see also</u> <u>Xianli Zhang v. United States</u>, 640 F.3d 1358, 1368 (Fed. Cir.) (citing <u>Cathedral Candle Co. v. U.S. Int'l Trade Comm'n</u>, 400 F.3d 1352, 1365 (Fed. Cir. 2005)), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2011), <u>cert. denied</u>, 566 U.S. 986 (2012); <u>Hanlin v. United States</u>, 214 F.3d 1319, 1321 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2000).

The United States Supreme Court also has held that the specific terms of a statute supersede general terms within that statute or within another statute that might otherwise control. <u>See</u> <u>Fourco Glass Co. v. Transmirra Prods. Corp.</u>, 353 U.S. 222, 228–29 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (quoting <u>D. Ginsberg & Sons v. Popkin</u>, 285 U.S. 204, 208 (1932))); <u>see also</u> <u>Bloate v. United States</u>, 559 U.S. 196, 207 (2010); <u>Bulova Watch Co. v. United States</u>, 365 U.S. 753, 761 (1961). In addition, the Supreme Court has endorsed "the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.'" <u>Gustafson v. Alloyd Co.</u>, 513 U.S.

561, 570 (1995) (quoting Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994)); see also Kislev Partners, L.P. ex rel. Bahar v. United States, 84 Fed. Cl. 385, 389, recons. denied, 84 Fed. Cl. 378 (2008).

If a statute is unequivocal on its face or the meaning of the statute is plain, there is usually no need to resort to the legislative history underlying the statute. See Whitfield v. United States, 543 U.S. 209, 215 ("Because the meaning of [the statute's] text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history . . . ."), reh'g denied sub nom. Hall v. United States, 544 U.S. 913 (2005); but see Chamberlain Grp., Inc. v. Skylink Techs., Inc., 381 F.3d 1178, 1196 (Fed. Cir.) ("Though 'we do not resort to legislative history to cloud a statutory text that is clear,' Ratzlaf v. United States, 510 U.S. 135, 147–48 (1994), we nevertheless recognize that 'words are inexact tools at best, and hence it is essential that we place the words of a statute in their proper context by resort to the legislative history.'" (quoting Tidewater Oil Co. v. United States, 409 U.S. 151, 157 (1972))), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 544 U.S. 923 (2005). In limited circumstances, legislative history may be helpful in certain instances "to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law." Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011) (citing Exxon Mobile Corp. v. Allapatah Servs., Inc., 545 U.S. 546, 568 (2005); see also Xianli Zhang v. United States, 640 F.3d at 1373. Legislative history, however, does not "trump[] clear text." Bartels Trust for the Benefit of Cornell Univ. ex rel. Bartels v. United States, 617 F.3d at 1361 (citing Sharp v. United States, 580 F.3d at 1238; Glaxo Operations UK Ltd. v. Quigg, 894 F.2d 392, 396 (Fed. Cir. 1990)). The Supreme Court, however, has noted that when it appears that the plain language of a statute resolves the issue, a court is to "look to the legislative history to determine only whether there is [a] 'clearly expressed legislative intention' contrary to that language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses." INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987) (citing United States v. James, 478 U.S. 597, 606 (1986), abrogated on other grounds by Cent. Green Co. v. United States, 531 U.S. 425, 436 (2001); Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)).

The amended section 212 of the 1954 Act, quoted above, provides for procedures by which the District is to be paid for sewer services rendered to the federal entities situated in the District. The general instruction appears in section 212(a), which states:

> The sanitary sewer service charges prescribed herein shall be applicable to all sanitary sewer services furnished by the sanitary sewage works of the District through any connection thereto for direct use by the government of the United States or any department, independent establishment, or agency thereof, and such charges shall be predicated on the value of water and water services received by such facilities of the government of the United States or any department, independent establishment, or agency thereof from the District water supply system. Payment of the said sanitary sewer service charge shall be made as provided in subsection (b) of this section.

D.C. Code § 34-2112(a). As the immediately above-quoted provision states, sanitary sewer service charges are to be "predicated on the value of water and water services

received by" each federal entity. The value of water and water service are provided in the D.C. Code at section 34-2401.25, titled: "Water and water service supplied for the use of the government of the United States," which states, in relevant part:

> All water and water services furnished from the District water supply system through any connection thereto for direct use by the government of the United States or any department, independent establishment, or agency thereof, situated in the District, except water and water services furnished to the United States for the maintenance, operation, and extension of the water system, shall be paid for at the rates for the furnishing and readiness to furnish water applicable to other water consumers in the District.

D.C. Code § 34-2401.25. Reading D.C. Code sections 34-2112(a) and 34-2401.25 together, the United States is to pay for all sanitary sewer services rendered to it by the District, and the cost of such services are to be based on what the District charges the United States to supply water to the United States, which is equivalent to what the District charges the District's public to supply water.

In order for the District to be paid for sewer services rendered to the United States, there must be compliance with certain prerequisites identified in the provision of subsection 212(b), as currently amended and incorporated into the D.C. Code at section 34-2112(b). This subsection (b) divides responsibilities into three steps to be undertaken by: (1) the District, (2) the federal entities which receive sanitary sewer services from the District, and (3) the Secretary of the Treasury. See D.C. Code at § 34-2112(b)(1)–(3). These steps are to be complied with annually, and, with respect to the responsibilities of the federal entities and the Secretary of the Treasury, actions are required on a quarterly basis.

Starting with the instructions to the District, which are set forth in section 212(b)(2), "[b]y April 15 of each calendar year," the District is to produce annual estimates of sewer services used by the federal government "for the fiscal year commencing October 1st of the following calendar year." D.C. Code § 34-2112(b)(2). By way of example, by April 15, 2019, the District was to have produced its estimates for the fiscal year beginning on October 1, 2020, which, for purposes of the federal government's budget, is the fiscal year of 2021. See Budget of the United States, available at https://www.usa.gov/budget (last visited Sept. 10, 2021) ("The government's fiscal year runs from October 1 of one year to September 30 of the next."). Section 212(b)(2) also provides specific instructions to the District with respect to the format of the District's production of estimates. See D.C. Code § 34-2112(b)(2). Additionally, section 212(b)(2) states that the estimates are to be provided to "the Office of Management and Budget, the Secretary of the Treasury, and the head of each of the respective Federal departments, independent establishments, and agencies, for inclusion in the President's budget of the respective Federal departments, independent establishments, or agencies." Id. Section 212(b)(2) also requires the format of the estimates to include "the total estimated annual cost of such service and an itemized estimate of such costs by Federal department, independent establishment, or agency." Id. Section 212(b)(2) also requires that the estimates produced be adjusted

> as are necessary to (A) account for actual usage variances from the estimated amounts for the fiscal year ending on September 30th of the calendar year preceding April 15th, and (B) reflect changes in rates charged for water and sewer services resulting from public laws or rate covenants pursuant to water and sewer revenue bond sales.

Id. Therefore, for example, taking estimates which were to have been produced by the District on April 15, 2019, such estimates were to have accounted for any differences in usage from the estimates supplied for the fiscal year 2018, which estimates were to have been produced by the District by April 15, 2016.

In accordance with the instructions in section 212(b)(2), and, again, using April 15, 2019 as an example, the District was to comply with the following: (1) the estimates produced by the District by April 15, 2019 were to have been for the fiscal year 2021; (2) the estimates were to have been produced to the Office of Management and Budget, the Secretary of the Treasury, and the head of each of the respective federal entities located within the District to receive such services for the fiscal year 2021; (3) the estimates were to have included the total amount estimated to be due for all sanitary sewer services rendered to the United States government in the fiscal year 2021, as well as that total itemized by each federal department, independent establishment, and agency receiving such sewer services; and (4) the estimates were to have been adjusted to reflect the actual usage variances from the estimates which were to have been submitted for the fiscal year 2018 and which were to have been submitted by April 15, 2016, as well as any changes in rates resulting from public laws or rate covenants entered into pursuant to water and sewer revenue bond sales.

Section 212(b)(3) contains instructions for each of the federal entities which are to receive sanitary sewer services within the District. The instructions delegated to each federal entity are triggered by the District's production of estimates, discussed immediately above. According to section 212(b)(3):

> Each Federal department, independent establishment, or agency receiving sanitary sewer services in buildings, establishments, or other places shall pay from funds specifically appropriated or otherwise available to it, quarterly and on the first day of each such fiscal quarter, to an account in the United States Treasury entitled "Federal Payment for Water and Sewer Services" an amount equal to one-fourth (25 percent) of the annual estimate for said services as provided for in paragraph (2) of this subsection.

D.C. Code § 34-2112(b)(3) (capitalization in original). For example, on October 1, 2020, each federal entity was to have paid to the above-referenced Treasury account one-fourth of its estimated, allocated amount for the fiscal year 2021, which amount, as discussed above, was to have been produced by the District by April 15, 2019. An additional one-fourth payment of the estimated fiscal year 2021 was to have been submitted by each federal entity by January 1, 2021, April 1, 2021, and July 1, 2021, respectively. As also discussed above, the estimates produced for the fiscal year 2021 were to have included an adjustment representing the actual costs of services from the fiscal year 2018, and, therefore, the payments starting on October 1, 2020 by each federal entity also were to have reflected such adjustments.

34

Section 212(b)(3) contains the instructions for the Secretary of the Treasury. Although section 212(b)(2) charges each Federal entity with the primary responsibility to pay the estimated funds, section 212(b)(1) contemplates that it is the Secretary of the Treasury who is charged with executing the actual payment of the estimated funds to the District. See D.C. Code § 34-2112(b)(1). Section 212(b)(1) states:

> In accordance with the provisions of paragraphs (2) and (3) of this subsection, one-fourth (25 percent) of the annual estimate prepared by the District government shall be paid, not later than the second day of each fiscal quarter, to the District government by the Secretary of the Treasury from funds deposited by said departments, establishments, or agencies in a United States Treasury account entitled "Federal Payment for Water and Sewer Services".

Id. Additionally, in the "absence of sufficient funds" in the above-referenced United States Treasury account, section 212(b)(1) instructs that "payment shall be made by the Secretary of the Treasury from funds available to the ~~United States Treasury and shall be reimbursed promptly to the United States Treasury by the~~ respective user agencies."[10] Id. Furthermore, section 212(b)(1) states that "[p]ayments shall be made to the District government by the Secretary of the Treasury without further justification, and shall be equal to one-fourth (25 percent) of the annual estimate prepared by the District government pursuant to paragraph (2) of this subsection." Id.

Reconciliation Between the 1938 Agreement and Section 212 of the 1954 Act, as Currently Amended and Codified at D.C. Code § 34-2112

The parties' dispute in the above-captioned case revolves around the effect of the 1938 Agreement in light of section 212 of the 1954 Act, as currently amended. As discussed above, in the 1938 Agreement, the parties' predecessors-in-interest agreed that, in exchange for the Soldiers' Home's permission for the District to install and access a water reservoir on the Soldiers' Home's premises "for use in connection with the water supply system," the Soldiers' Home would have "the perpetual right to use water from the water supply system of the District of Columbia, as may be needed, for the purpose of said Home, including water for fire protection purposes without compensation therefore at any time." Defendant argues that such language in the 1938 Agreement must be interpreted to allow the AFRH, the Soldiers' Home's successor-in-interest, to receive, in addition to water services free of charge and in perpetuity, sewer services free of charge also in perpetuity. Plaintiff disagrees that uncompensated sewer services were included in the 1938 Agreement. Moreover, plaintiff argues, regardless of what was agreed to in the 1938 Agreement, section 212 of the 1954 Act obligates each federal entity situated in the District, including the AFRH, to pay for sewer services rendered to it by the District. As noted above, defendant does not dispute that Congress possesses the authority to enact legislation which could nullify the 1938 Agreement and obligate the AFRH to pay for sewer services rendered. As further noted above, defendant also does not dispute that section 212 of the 1954 Act mandates payment from federal entities receiving

---

[10] As discussed above, the crossed-out language was stricken by the Consolidated Appropriations Act for FY2001.

sanitary sewer services within the District, but argues that the AFRH is excepted from such a mandate. Defendant argues that any legislation subsequent to the 1938 Agreement would have had to explicitly evidence congressional intent to nullify the 1938 Agreement. Defendant further argues that section 212 of the 1954 Act does not evidence explicit congressional intent to nullify the 1938 Agreement because section 212 makes no reference the AFRH or the 1938 Agreement.

The United States Supreme Court recently discussed the authority of Congress to mandate the government to pay compensation through the enactment of legislation. See generally Me. Cmty. Health Options v. United States, 140 S. Ct. 1308 (2020). In Maine Community Health Options, the Supreme Court ruled on the effect of a statute which, on its face, appeared to mandate the government to reimburse health insurers participating in the national health exchanges created by the Patient Protection and Affordable Care Act (ACA) under certain circumstances. See id. at 1320–21. The Supreme Court found that "Congress can create an obligation directly through statutory language." Id. at 1321. According to the Supreme Court, the statute at issue in Maine, section 1342 of the ACA "imposed a legal duty of the United States that could mature into a legal liability through the insurers' actions—namely, their participating in the healthcare exchanges." Me. Cmty. Health Options v. United States, 140 S. Ct. at 1320. The Supreme Court explained:

> This conclusion flows from § 1342's express terms and context. See, e.g., Merit Management Group, LP v. FTI Consulting, Inc., 583 U.S. ----, ----, 138 S. Ct. 883, 893, 200 L.Ed.2d 183 (2018) (statutory interpretation "begins with the text"). The first sign that the statute imposed an obligation is its mandatory language: "Shall." "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." Kingdomware Technologies, Inc. v. United States, 579 U.S. ----, ----, 136 S. Ct. 1969, 1977, 195 L.Ed.2d 334 (2016); see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35, 118 S. Ct. 956, 140 L.Ed.2d 62 (1998) (observing that "'shall'" typically "creates an obligation impervious to . . . discretion").

Me. Cmty. Health Options v. United States, 140 S. Ct. at 1320. The Supreme Court in Maine observed that section 1342 of the ACA used the "shall" "command three times," and that Congress opted to use the term "shall" instead of the term "may," despite the use of the latter term in section 1342's "adjacent provisions." Me. Cmty. Health Options v. United States, 140 S. Ct. at 1320.

Related to the above-captioned case, section 212 of the 1954 Act, as currently amended, uses the term "shall" fifteen times.[11] By way of example, and relevant to the federal government's obligations, section 212 of the 1954 Act uses the term "shall" to instruct: (1) that the "sanitary sewer service charges prescribed herein shall be applicable to all sanitary sewer services" rendered by the District to federal entities of United States situated in the District; (2) that the District "shall receive payment for sanitary sewer services from funds appropriated or otherwise available to" the federal entities situated in

---

[11] The term "shall" also appears one time in the text stricken by the Consolidated Appropriations Act for FY2001, discussed above.

the District; (3) that "[e]ach" federal entity "<u>shall</u> pay" the sanitary sewer service charges into the named United States Treasury account "from funds specifically appropriated to it;" (4) that, even in absence of sufficient funds in the named Treasury account, "payments <u>shall</u> be made" to the District "by the Secretary of the Treasury;" and (5) that "[p]ayments <u>shall</u> be made to the District government by the Secretary of the Treasury <u>without further justification</u>." D.C. Code § 34-2112 (all emphasis added). The term "may" is used only once in section 212, appearing in section 212(c), to indicate that "[n]othing in this section <u>may</u> be construed to require" the District of Columbia "to seek payment for sanitary sewer services directly from any Federal entity which is under the jurisdiction of a department, independent establishment, or agency which is required to make a payment for such services under this section." D.C. Code § 34-2112(c) (emphasis added).

Given the use of the term "shall" fifteen times in section 212 of the 1954 Act, the court finds that section 212, as currently amended and codified in the D.C. Code at section 34-2112, can create "a legal duty of the United States" that matures into a "legal liability" if not fulfilled. <u>See</u> <u>Maine Cmty. Health Options v. United States</u>, 140 S. Ct. at 1320. As was the case in <u>Maine</u>, however, in which the legal liability was contingent upon the "insurers' actions—namely, their participating in the healthcare exchanges," this court finds that the legal liability imposed upon the United States by section 212 of the 1954 Act is contingent upon the "actions" of the District, namely, the District's mandatory production of its annual estimates, or what the parties refer to as the District's annual FCSE submission.

As indicated above, section 212(b)(2) of the 1954 Act, as amended, instructs that the District "shall" comply with the following: (1) by April 15 of each year, the District must produce estimates of the costs to render sanity sewer services to federal entities in the District for the fiscal year beginning the following calendar year; (2) such estimates must be produced to the Office of Management and Budget, the Secretary of the Treasury, and the head of each of the respective federal entity within the District receiving such services; (3) such estimates must indicate the total amount estimated to be due for all sanitary sewer services rendered to the United States government for the relevant fiscal year, as well as that total itemized by each federal entity to receive such sewer services; and (4) such estimates must be adjusted to reflect the actual usage variances from the estimates for the fiscal year preceding April 15th, as well as any changes in rates resulting from public laws or rate covenants entered into pursuant to water and sewer revenue bond sales. <u>See</u> D.C. Code § 34-2112(b)(2). If the District does not timely produce its statutorily required estimates to the various federal entities receiving sanitary sewer services within the District, as well as to the Secretary of the Treasury and the Office of Management and Budget, the issue becomes whether the subsequent obligations of a federal entity, such as the AFRH, are triggered. A federal entity receiving sanitary sewer services from the District would have great difficulty to be able to determine what the federal entity would be obligated to pay into the named Treasury account, and, in the event of a federal entity's nonpayment of the proper amount into the Treasury account, the Secretary of the Treasury would also have great difficulty to know what amount is due to be paid to the District. Therefore, unless the District first completes its statutory obligations, as set forth in section 212(b)(2) of the 1954 Act, to properly inform the United States of its estimated sanitary sewer service charges, the United States' payments equal to such estimated

amounts for sanitary sewer services, as set forth in sections 212(b)(1) and (3), do not mature into a legal liability for the United States to pay such estimated sanitary sewer service charges to the District.

Aside from the above condition that, in order to receive payment, the District must comply with all the instructions set forth in section 212(b)(2) of the 1954 Act, as currently amended, with respect to its production of estimates, section 212 contains no other contingencies or exceptions which would permit any federal entity the discretion not to execute the required payments into the named Treasury account, or which would permit the Secretary of the Treasury the discretion not to execute the required payments to the District. By the plain language of section 212, there is no exemption for a federal entity, such as the AFRH which receives sanitary sewer services delivered by the District, from submitting the required payments into the named Treasury account. To the contrary, "[t]he sanitary sewer service charges" in section 212 "shall be applicable to all sanitary sewer services furnished by the sanitary sewage works of the District through any connection thereto for direct use by the government of the United States or any department, independent establishment, or agency thereof," see D.C. Code § 34-2112(a) (emphasis added), and "[e]ach Federal department, independent establishment, or agency receiving sanitary sewer services in buildings, establishments, or other places shall pay from funds specifically appropriated or otherwise available to it, quarterly and on the first day of each such fiscal quarter," into the named Treasury account, for payment to the District. See id. § 34-2112(b)(2) (emphasis added). Although defendant argues that Congress would have had to explicitly subject the AFRH to make sanitary sewer service payments, or otherwise explicitly nullify the 1938 Agreement so as to subject the AFRH to make sanitary sewer service payments, such a reading of section 212 would be in direct contradiction with section 212's express, catchall instructions that the District is to be paid for all sanitary sewer services rendered, and that each department, independent establishment, or agency of the United States is to pay for all such services it receives. See King v. Burwell, 576 U.S. at 474 ("If the statutory language is plain, we must enforce it according to its terms." (citing Hardt v. Reliance Standard Life Ins. Co., 560 U.S. at 251); Sucic v. Wilkie, 921 F.3d at 1098 (quoting Barnhart v. Sigmon Coal Co., 534 U.S. at 450); Bettcher Indus., Inc. v. Bunzl USA, Inc., 661 F.3d at 644; see also Arko Foods Int'l, Inc. v. United States, 654 F.3d at 1364 (quoting Millenium Lumber Distrib., Ltd. v. United States, 558 F.3d at 1328); Am. Airlines, Inc. v. United States, 551 F.3d at 1300.

This court, therefore, finds that provided the proper furnishing of estimates by the District occurs, section 212 of the 1954 Act creates a mandatory obligation for federal entities within the District, including the AFRH, to pay for sanitary sewer services rendered by the District. Section 8 of Article I of the Constitution vests explicit authority in Congress "[t]o exercise exclusive legislation in all cases whatsoever, over" the District of Columbia. See U.S. Const. art 1, § 8. Therefore, despite the silence in the 1938 Agreement as to the provision of sewer services, free or not, or in perpetuity or not, and even if the 1938 Agreement could be read to include the District's providing sanitary sewer services without the AFRH having to pay, the 1938 Agreement was always going to be subject to potential, subsequently enacted legislation by Congress concerning the obligations of the United States related to sewer charges by the District.

As noted above, in the case currently before the court, the District only seeks to be paid sewer services charges, not paid for water service charges. The parties do not dispute that free water services were agreed to in the 1938 Agreement. In very similar language to section 212 of the 1954 Act, section 106 of the 1954 Act, as currently amended and incorporated into the D.C. Code at § 34-2401.25 (2021), requires that all federal entities of the United States within the District, including the AFRH, make payments for water and water services rendered to it by the District. Section 106(a) of the 1954 Act provides, as currently amended and codified at D.C. Code § 34-2401.25:

> All water and water services furnished from the District water supply system through any connection thereto for direct use by the government of the United States or any department, independent establishment, or agency thereof, situated in the District, except water and water services furnished to the United States for the maintenance, operation, and extension of the water system, shall be paid for at the rates for the furnishing and readiness to furnish water applicable to other water consumers in the District.

Id. § 34-2401.25(a). Section 106 also states:

> Each Federal department, independent establishment, or agency receiving water services in buildings, establishments, or other places shall pay from funds specifically appropriated or otherwise available to it, quarterly and on the first day of each such fiscal quarter, to an account in the United States Treasury entitled "Federal Payment for Water and Sewer Services" an amount equal to one-fourth (25 percent) of the annual estimate for said services as provided for in paragraph (2) of this subsection.

Id. § 34-2401.25(b)(1). Section 106 of the 1954 Act, as currently amended, also requires the proper furnishing of estimates by the District, in the same fashion as Section 212 of the 1954 Act, as currently amended:

> By April 15 of each calendar year the District shall provide the Office of Management and Budget, the Secretary of the Treasury, and the head of each of the respective Federal departments, independent establishments, and agencies, for inclusion in the President's budget of the respective Federal departments, independent establishments, or agencies, an estimate of the cost of service for the fiscal year commencing October 1st of the following calendar year. The estimate shall provide the total estimated annual cost of such service and an itemized estimate of such costs by Federal department, independent establishment, or agency. The District's estimates on a yearly basis shall reflect such adjustments as are necessary to (A) account for actual usage variances from the estimated amounts for the fiscal year ending on September 30th of the calendar year preceding April 15th, and (B) reflect changes in rates charged for water and sewer services resulting from public laws or rate covenants pursuant to water and sewer revenue bond sales.

Id. § 34-2401.25(b)(2).

Prior to the 1938 Agreement, as well as prior to the 1954 Act, it appears that the United States was not required to pay for either water or sewer services rendered by the District. As noted above, defendant tries to argue that reading the 1954 Act to obligate the AFRH's payment for both water and sewer services renders the 1938 Agreement an illusory agreement, because, according to defendant, the AFRH would then have received nothing in return for having permitted the District an easement to build and access a water reservoir on its premises. As explained, however, in the documents of correspondence between the District and the AFRH leading up to the 1938 Agreement, the District identified building a water reservoir on the grounds of the AFRH as necessary for the proper operation of the water supply system throughout the District. As discussed above, in a January 6, 1938 letter from the President of the Board of Commissioners of the District, the Honorable. Melvin C. Hazen, to the Governor of the Soldiers' Home, Major General Frederick W. Coleman, the Honorable Melvin C. Hazen stated:

> In view of the absolute necessity of ample water supply at adequate pressure, not only for Federal institutions but also in the interest of the general public welfare, your renewed consideration of our request for permission to locate a vitally important storage reservoir on high ground within the territory under the jurisdiction of the Board of Commissioners of the United States Soldiers' Home is requested.

> Our renewed request that you grant this permission would not be made but for the fact that the proposed site is the only one considered feasible. The engineers of the District of Columbia Water Division have made a comprehensive survey of all possible sites for a reservoir and after exhaustive study have reluctantly reached the conclusion that all contemplated alternates are impracticable.

The necessity of the water reservoir also was acknowledged by a member of the Board of Commissioners of the Soldiers' Home, prior to the letter from the Honorable Melvin C. Hazen. As noted above, the record reflects that General Pillsbury acknowledged at the October 25, 1937 Board of Commissioners meeting:

> I have gone into the matter and I believe without any question this proposed installation is necessary to safe-guard the water supply of the District of Columbia in the increasing drain and demand on the service. The increased water demand is such that the water is filtered at the McMillan plant here at an excessive rate. This installation is designed to offer a reserve supply so that the filters could be run at the regular rate in the day time and the surplus water filtered at night could be drawn on during the following day. There is an emergency in the water supply of the District that I think makes this installation necessary. The only reasonable solution is the installation of the reservoir so as to afford a reserve supply.

Therefore, permission by the Soldiers' Home for the District to build the water reservoir was a direct benefit to the United States and its government buildings, including the Solders' Home, because, once the water reservoir was built, the Soldiers' Home, as well as other government entities in the District, would not be affected by an inadequately

constructed and operated water supply system, and at that time memorialized the provision of free water to the AFRH. Moreover, that the 1938 Agreement always remained subject to changes at a later time as a result of legislation subsequently enacted by Congress that might obligate the AFRH to pay for both water and sewer services, does not make the 1938 Agreement illusory merely because such legislation ultimately came to fruition. In its authority over matters concerning the District, Congress had, and has, the discretion to include, or not to include, mandatory language in sections 106 and 212 of the 1954 Act. As currently amended by Congress, the AFRH, along with all other United States entities situated within the District receiving water and sewer services, are required to pay for water and sewer services received, in accordance with the express provisions of the 1954 Act.

The District's Compliance with the Submission Requirements of Section 212 of the 1954 Act, as Currently Amended

Plaintiff's amended complaint alleges: "Beginning in 2004, and at regular intervals since, DC Water has billed the AFRH for sewer services provided by DC Water." At oral argument, plaintiff's counsel of record explained that DCWS had been sending "monthly bills" to the AFRH, although only two actual billings were produced for inclusion in the record before the court. Plaintiff's submissions to the court also include a "true-up" statement which the District alleged was sent to the Treasury on January 23, 2019, which defendant does not dispute, in which plaintiff allegedly provided the costs of what the District claimed were "**Actual**" usage fees incurred by the AFRH for sewer services, including certain impervious area charges, organized by fiscal years, from the fiscal years of 2017 to 2010, as well as for charges for "**PRE FY2010**." (capitalization and emphasis in original). Plaintiff's amended complaint also states: "At least once every year, on or before April 15th, DC Water provides the United States its estimate of the cost of service for the upcoming fiscal years for each of the United States' agencies, federal department, and independent establishments," and that the estimate "includes adjustments to account for actual usage variances from its estimated amounts and changes in rates charged for water and sewer services resulting from public laws or rate covenants pursuant to water and sewer revenue bond sales." Plaintiff, however, concedes that it did not include the AFRH in its annual FCSE until the District's April 15, 2019 FCSE submission for the 2021 fiscal year. The record before the court includes the April 15, 2019 FCSE, as well as a July 16, 2019 revision of the April 15, 2019 FCSE, both of which include sewer service charges the District estimated it would provide in the 2021 fiscal year to the AFRH, as well as water and sewer service charges the District estimated it would provide to many other United States entities situated within the District for the 2021 fiscal year. The April 15, 2019 FCSE and the July 16, 2019 revision reflect that those documents were submitted to the Office of Management and Budget, as well as to the Department of Treasury. Plaintiff also states that the submissions were sent to the AFRH. Defendant does not dispute that the April 15, 2019 FCSE, or the July 16, 2019 revision of the April 15, 2019 FCSE, were sent to various entities of the United States, including the AFRH, nor does defendant dispute that original and revised 2019 FCSE for the 2021 fiscal year were sent on April 15, 2019, and July 16, 2019, respectively. In addition, both the April 15, 2019 FCSE and the July 16, 2019 revision included, with respect to the AFRH, an adjustment to account for an alleged amount owed due to "billing from 2012 to 2018."

41

As discussed above, this court has determined that section 212 of the 1954 Act, as currently amended and codified at D.C. Code § 34-2112, created mandatory payment obligations for the AFRH, as well as for each federal entity receiving sanitary sewer services provided by the District, contingent upon the District's proper production and presentation of fiscal year estimates, as set forth in section 212 of the 1954 Act, as currently amended and codified at D.C. Code in section 34-2112. As indicated above, the District's production and presentation of annual estimates "shall" conform to the following instructions: (1) by April 15 of each year, the District is to produce estimates of the costs to render sanity sewer services to the federal entities in the District for the fiscal year beginning the following calendar year; (2) such estimates are to be produced to the Office of Management and Budget, the Secretary of the Treasury, and the head of each of the respective federal entity within the District to receiving such services; (3) such estimates are to indicate the total amount estimated to be due for all sanitary sewer services rendered to the United States government for the relevant fiscal year, as well as that total itemized by each federal entity to receive such sewer services; and (4) such estimates are to be adjusted to reflect the actual usage variances from the estimates for the fiscal year preceding April 15th, as well as any changes in rates resulting from public laws or rate covenants entered into pursuant to water and sewer revenue bond sales. See D.C. Code § 34-2112(b)(2).

The record before the court does not indicate that before 2019 plaintiff included in its annually submitted FCSE any estimated costs of services to account for usage by the AFRH, despite multiple opportunities and requests from this court to submit such evidence. Although plaintiff has alleged it made submissions of monthly billings for sewer services to the AFRH since 2004, as well as the submission of a "true-up" sent to the Treasury on January 23, 2019, for various charges incurred by the AFRH from fiscal years 2017 to 2010 and earlier, those submissions did not comply with the requirements in section 212 that the District was to have submitted such charges prospectively, and by April 15th, on an annual basis, not only to AFRH, but to the Secretary of the Treasury, as well as to the Office of Management and Budget for inclusion in the President's budget for the AFRH. See D.C. Code § 34-2112(b)(2). Because plaintiff's attempts to bill the AFRH for sewer services prior to 2019 were not in compliance with section 212's mandatory submission requirements, the United States is not obligated retroactively to pay for such sanitary sewer services alleged by plaintiff to be retrospectively owed.

The only instance in the record before the court in which plaintiff appears to have complied with section 212's mandatory submission requirements with respect to the AFRH was in 2019, as described above, when the District submitted its 2019 FCSE for the fiscal year 2021, on April 15, 2019, and then submitted a revised version of the 2019 FCSE for the fiscal year 2021 on July 16, 2019. Plaintiff's April 15, 2019 FCSE submission was in compliance with the statutory submission requirements in section 212, in that: (1) it was submitted "by April 15" of 2019; (2) it included sanitary sewer service charges estimated to be due for the fiscal year 2021; and (3) it was submitted to "the Office of Management and Budget, the Secretary of the Treasury, and the head of" the AFRH. Plaintiff, therefore, can be entitled to the costs of sanitary sewer services estimated to be due for the 2021 fiscal year, and an amount equivalent to one-fourth of such costs should have been included in the AFRH's deposit into the "Federal Payment for Water and Sewer

Services" Treasury account on October 1, 2020, January 1, 2021, April 1, 2021, and July 1, 2021, respectively, and such amounts should have been included in the executed payments by the Secretary of the Treasury to the District on October 2, 2020 January 2, 2021, April 2, 2021, and July 2, 2021, respectively.

As discussed above, plaintiff's 2019 FCSE for the 2021 fiscal year included adjustments to the AFRH's fiscal year 2021 estimated sewer service charges for "billing from 2012 to 2018 for Department of Defense- AFRH in the amount of $7.5 million." Plaintiff, however, is not entitled to adjustments for past years with respect to the AFRH because the District did not include in its annual estimates, any estimated charges due for the AFRH. Section 212(b)(2) of the 1954 Act provides that "[t]he District's estimates on a yearly basis shall reflect such adjustments as are necessary to (A) account for actual usage variances from the estimated amounts for the fiscal year ending on September 30th of the calendar year preceding April 15th." D.C. Code § 34-2112(b)(2). In the case of plaintiff's 2019 annual submission for the 2021 fiscal year, section 212(b)(2) required the District to adjust its 2021 fiscal year annual estimates to account for the difference between the United States' actual cost of usage for sanitary sewer services in the 2018 fiscal year from what the District estimated was to be the cost of usage for the 2018 fiscal year. Because the District did not submit any sanitary sewer service charges estimated to be due for the AFRH in its annual fiscal year 2018 submission, or any other prior year before its submission of the 2019 FCSE, and, subsequently, did not receive any payments from the AFRH associated with its 2018 fiscal year submission, plaintiff now would not be entitled to an adjustment of its 2021 fiscal year estimates.

<u>Entitlement to Impervious Area Charges</u>

In its amended complaint, plaintiff included a request for payment of "sewer service and impervious area charges" by the AFRH. As indicated above, the DCWS website provides the following explanation of its impervious area charges:

> Impervious surfaces such as rooftops, paved driveways, patios, and parking lots are major contributors to stormwater runoff entering the District's combined sewer system. This adds significantly to pollution in the Anacostia and Potomac Rivers and Rock Creek.

> The Clean Rivers Impervious Area Charge (CRIAC) is a fair way to distribute the cost of maintaining storm sewers and protecting g area waterways because it is based on a property's contribution of rainwater to the District's sewer system. Because charges are based on the amount of impervious area on a property, owners of large office buildings, shopping centers and parking lots will be charged more than owners of modest residential dwellings.

> All residential, multi-family and non-residential customers are billed a CRIAC. The charge is based on an Equivalent Residential Unit (ERU). An ERU is a statistical median of the amount of impervious surface area in a single-family residential property, measured in square feet.

Available at https://www.dcwater.com/impervious-area-charge.

Plaintiff's amended complaint states:

Beginning in 2004, and at regular intervals since, DC Water has billed AFRH for sewer services provided by DC Water to AFRH-W at the rates set by the DC Retail Water and Sewer Rates Committee and for Impervious Surface Area charges ("IAC") that are part and parcel of sewer services.

(capitalization in original; footnote omitted).

In defendant's motion to dismiss, defendant states:

The District's first amended complaint relies on the D.C. Public Works Act of 1954 as the jurisdictional basis for the District's claim for stormwater charges. The District's reliance is misplaced because section 212 is explicitly limited to "sanitary sewer service charges," and section 201 [of the 1954 Act] differentiates between "sanitary sewage" and "stormwater sewage." The District's impervious surface area charges relate to stormwater sewage, not sanitary sewage. See DCMR § 556.1, 3, 5, (Stormwater Fees); 21 DCMR § 4101.3.

(capitalization in original; brackets added; internal references omitted). Defendant further argues that "[t]he substantive law the District must rely on for its claim for stormwater charges is 33 U.S.C. § 1323," and notes "the obvious applicability of 33 U.S.C. § 1323 to stormwater." The statute at 33 U.S.C. § 1323 (2018), enacted as part of the Federal Facilities Section of the Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92–500, 86 Stat. 816 (the Clean Water Act), states, as currently amended, in relevant part:

**(a)** Compliance with pollution control requirements by Federal entities

Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. . . . This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law. . . .

**(c) Reasonable service charges**

**(1) In general**

For the purposes of this chapter, reasonable service charges described in subsection (a) include any reasonable nondiscriminatory fee, charge, or assessment that is--

**(A)** based on some fair approximation of the proportionate contribution of the property or facility to stormwater pollution (in terms of quantities of pollutants, or volume or rate of stormwater discharge or runoff from the property or facility); and

**(B)** used to pay or reimburse the costs associated with any stormwater management program (whether associated with a separate storm sewer system or a sewer system that manages a combination of stormwater and sanitary waste), including the full range of programmatic and structural costs attributable to collecting stormwater, reducing pollutants in stormwater, and reducing the volume and rate of stormwater discharge, regardless of whether that reasonable fee, charge, or assessment is denominated a tax.

**(2) Limitation on accounts**

**(A) Limitation**

The payment or reimbursement of any fee, charge, or assessment described in paragraph (1) shall not be made using funds from any permanent authorization account in the Treasury.

**(B) Reimbursement or payment obligation of Federal Government**

Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government, as described in subsection (a), shall not be obligated to pay or reimburse any fee, charge, or assessment

> described in paragraph (1), except to the extent
> and in an amount provided in advance by any
> appropriations Act to pay or reimburse the fee,
> charge, or assessment.

Id. (emphasis in original). Defendant in the above-captioned case, however, argues that because plaintiff's amended complaint does not assert 33 U.S.C. § 1323 as a basis for entitlement to stormwater charges, "the portion of the District's complaint seeking stormwater charges should be dismissed pursuant to RCFC 12(b)(6)." Defendant also cites to DeKalb County, Georgia v. United States, 108 Fed. Cl. 681 (2013), in which a Judge of this court found that 33 U.S.C. § 1323, as amended in 1977, waived the United States' sovereign immunity for stormwater assessments considered service fees, but did not waive such immunity for stormwater assessments considered taxes until 33 U.S.C. § 1323 was subsequently amended in 2011, after which sovereign immunity for stormwater assessments considered taxes was waived. In DeKalb County, plaintiff, DeKalb County, was attempting to collect DeKalb County "stormwater utility charges" prior to 2011. See DeKalb Cnty., Ga. v. United States, 108 Fed. Cl. at 687. The Judge in DeKalb County determined DeKalb County was not entitled to such stormwater assessments because the DeKalb the court found that such charges were to be considered taxes, not fees. See generally id. at 694–710.

In plaintiff's response to defendant's motion to dismiss, plaintiff disagrees with defendant that section 212 of the 1954 Act's mandate does not include stormwater charges. Relying on the definitions provided in section 201 the 1954 Act, plaintiff argues that the charges mandated in section 212 of the 1954 Act "are applicable 'to all sanitary sewage works of the District.'" (emphasis added by plaintiff) (citing subsection 212(a) of the 1954 Act). Plaintiff continues:

> "Sanitary sewage works" means "a system of sanitary and combined sewers, appurtenances, pumping stations, and treatment works for conveying, treating, and disposing of sanitary sewage." "Combined sewer" means "a sewer which carries both sanitary sewage and stormwater sewage." "Stormwater sewage" means "liquid flowing in sewers resulting directly from precipitation."

(emphasis added by plaintiff; internal citations and footnotes omitted). Plaintiff also disagrees with defendant's assertion that 33 U.S.C. § 1323 is the proper avenue to seek stormwater charges, stating:

> Contrary to the United States' position, the Federal Facilities Pollution Control provision of the Clean Water Act ("Federal Facilities Section"), 33 U.S.C. § 1323, does not control the instant issue of whether DC Water may demand payment for impervious area charges from the United States. Rather, this section governs water pollution and merely requires the Government to comply with all applicable law and to pay "reasonable service charges."

Plaintiff continues:

> The Federal Facilities Pollution Control ("FFC") provision of the Clean Water Act ("CWA") merely provides the necessary waiver of sovereign immunity for DC Water to charge for stormwater services. Both federal provisions work in conjunction by first granting permission for the District of Columbia to charge for stormwater <u>via</u> the FFC and then delineating the way the District may seek compensation <u>via</u> the 1954 Act. Indeed, DC Water charges for stormwater charges through its annual federal estimate which all other federal agencies accept.

(emphasis in original).

Responding to plaintiff's contention that "DC Water charges for stormwater charges through its annual federal estimate which all other federal agencies accept," defendant states:

> It is unclear what the District means by the phrase "which all other federal agencies accept.
>
> Whatever the District may mean, section 1323 *explicitly excludes* the payment of stormwater charges through Treasury's process. Section 1323 provides that "[t]he payment or reimbursement of any fee, charge, or assessment described in paragraph (1) shall not be made using funds from any permanent authorization account in the Treasury." 33 U.S.C. § 1323(c)(2)(A). The account Treasury uses for water and sewer charges is a "permanent authorization account" that is *not used* for stormwater charges. 33 U.S.C. § 1323(c)(2)(A). Thus as our prior filings have described, Treasury does not collect for stormwater charges from agencies, nor does it pay for any stormwater charges under 33 U.S.C. § 1323, from the permanent authorization account.

(emphasis in original; quotation marks to internal references omitted).

The 1954 Act provides the following definitions in section 201, codified at D.C. Code § 34-2101, and which particular section has not been amended since the 1954 Act's initial enactment:

> For the purposes of this subchapter:
>
> > **(1)** The term "sanitary sewage" means:
> >
> > > **(A)** Domestic sewage with storm and surface water limited;

**(B)** Sewage discharging from sanitary conveniences;

**(C)** Commercial or industrial wastes; and

**(D)** Water supply after it has been used.

**(2)** The term "stormwater sewage" means liquid flowing in sewers resulting directly from precipitation.

**(3)** The term "combined sewage" means sewage containing both sanitary sewage and stormwater sewage.

**(4)** The term "sewer" means a pipe or conduit carrying sewage.

**(5)** The term "sanitary sewer" means a sewer which carries sanitary sewage.

**(6)** The term "stormwater sewer" means a sewer which carries stormwater sewage.

**(7)** The term "combined sewer" means a sewer which carries both sanitary sewage and stormwater sewage.

**(8)** The term "sanitary sewage works" means a system of sanitary and combined sewers, appurtenances, pumping stations, and treatment works for conveying, treating, and disposing of sanitary sewage.

**(9)** The term "stormwater sewer system" means a system of sewers, appurtenances, and pumping stations for conveying and disposing of stormwater sewage.

**(10)** The term "combined sewer system" means a system of sewers and appurtenances conveying both sanitary sewage and stormwater sewage.

1954 Act § 201; see also D.C. Code § 34-2101 (emphasis in original).

Subsection 212(a) of the 1954 Act, as amended and codified at D.C. Code § 34-2112(a), states:

The sanitary sewer service charges prescribed herein shall be applicable to all sanitary sewer services furnished by the sanitary sewage works of the District through any connection thereto for direct use by the government of

> the United States or any department, independent establishment, or agency thereof, and such charges shall be predicated on the value of water and water services received by such facilities of the government of the United States or any department, independent establishment, or agency thereof from the District water supply system. Payment of the said sanitary sewer service charge shall be made as provided in subsection (b) of this section.

1954 Act § 212(a); see also D.C. Code § 34-2112(a) (emphasis added). Although section 201 of the 1954 Act and the section 34-2101 of the D.C. Code provide specific definitions for multiple different terms related to sewer and sanitary sewer, the 1954 Act and the D.C. Code do not provide a specific definition for "sanitary sewer service charges," the critical term for subsection 212(a) of the 1954 Act and D.C. Code § 34-2112(a).

As indicated in the definitions above, section 201 of the 1954 Act and the section 34-2101 of the D.C. Code define the term "sanitary sewer" as "a sewer which carries sanitary sewage." 1954 Act § 201; see also D.C. Code § 34-2101. The term "sanitary sewage" is defined in section 201 of the 1954 Act and the section 34-2101 of the D.C. Code as:

(A) Domestic sewage with storm and surface water limited;

(B) Sewage discharging from sanitary conveniences;

(C) Commercial or industrial wastes; and

(D) Water supply after it has been used.

1954 Act § 201; see also D.C. Code § 34-2101. Although it is not entirely clear what the words in section 201 of the 1954 Act and section 34-2101 of the D.C. Code, "with storm and surface water limited," mean, or if the words are meant as a limitation of storm and surface water as it relates to the term "Domestic sewage." Notably, section 201 of the 1954 Act provides separate definitions for "sanitary sewage" and "stormwater sewage," as well as "sanitary sewer" and "stormwater sewer." See D.C. Code § 34-2101 The 1954 Act does not explain why storm and surface water are limited. See id. Given, however, the distinct definitions in section 201 of the 1954 Act of sanitary sewage/sewer and stormwater sewage/sewer, and given section 212's multiple uses of the term "sanitary" to qualify the term "sewer," without reference to "stormwater," it appears that section 212's mandate for the United States to pay for sewer services was intended to be limited to sanitary sewer services charges, to the exclusion of stormwater sewer service charges.

In addition, section 212 of the 1954 Act, which, as discussed above, governs the United States' obligations to pay sanitary sewer service charges, was not amended to include reference to an impervious area charge. This is in contrast to section 207 of the 1954 Act, codified as amended at D.C. Code § 34-2107, which applies to the District's

building owners,[12] which makes no specific mention of an obligation of the United States to pay sewer service charges for its buildings. As originally enacted, section 207 provided, in relevant part:

> The sanitary sewer service charges established under the authority of this title shall be based on the water consumption of, and water services to, the properties served, and be determined by one of the following methods:
>
> (a) Where water is supplied from the District water supply system at meter rates, the Commissioners shall establish the sanitary sewer service charge as a percentage of the water charge applicable in the District, but such percentage shall not exceed 60 per centum of the water charge.

1954 Act § 207. In 2008, the D.C. Council amended D.C. Code § 34-2107, which tracks section 207 of the 1954 Act, to include the impervious area of a property as an additional basis upon which the District could determine the sanitary sewer service charges for a property. See Water and Sewer Authority Equitable Ratemaking Amendment Act of 2008, 2008 D.C. Sess. L. Serv. 17–370 (Act 17–705) ("AN ACT to amend the District of Columbia Public Works Act of 1954 to broaden the bases for the determination of sanitary sewer service charges to include impervious surface area and to provide for an appeal process for the assessment of an impervious surface area fee." (capitalization in original)). The provisions at D.C. Code § 34-2107 now provide for the "[m]ethods of determination of sanitary sewer services charges," as follows:

> (a) The sanitary sewer service charges established under the authority of this subchapter shall be based on the following:
>
> (1) A billing methodology which takes into account both the water consumption of, and water service to, a property and the amount of impervious surface on a property that either prevents or retards the entry of water into the ground as occurring under natural conditions, or that causes water to run off the surface in greater quantities or at an increased rate of flow, relative to the flow present under natural conditions. For the purposes of this paragraph, the term "surface" shall include rooftops, footprints of patios, driveways, private streets, other paved areas, athletic courts and swimming pools, and any path or walkway that is covered by impervious material.

D.C. Code § 34-2107(a)(1). Therefore, for building owners in the District, the impervious surface area of a property is included as part of the methodology for determining the cost of sanitary sewer services, and is in addition to the consideration of "the water

---

[12] D.C. Code § 34-2108 describes the "Persons obligated to pay sanitary sewer service charge," in subsection (a), as "[t]he owner or occupant of each building, establishment, or other place in the District connected with any District sewer conducting sanitary sewage shall pay the sewer service charge authorized by this subchapter." Id.

consumption of, and water service to," the property. See id. A United States' waiver of sovereign immunity, however, does not appear in section 207 of 1954 Act, as originally enacted, or as it currently appears at D.C. Code § 34-2107. Instead, the United States' waiver of sovereign immunity is in section 212(a) of 1954 Act, which, as discussed above, governs the United States' obligation to pay for sanitary sewer service charges, but does not include a property's impervious surface area as part of the basis upon which sanitary sewer services charges are predicated. Section 212(a) of 1954 Act has stated, since its enactment in 1954, that "[t]he sanitary sewer service charges prescribed herein shall be applicable to all sanitary sewer services furnished by the sanitary sewage works of the District through any connection thereto for direct use by the government of the United States or any department, independent establishment, or agency thereof, and such charge shall be predicated on the value of water and water services received by such facilities of the Government of the United States." D.C. Code § 34-2112(a) (emphasis added).

Although the D.C. Council amended the D.C. Code at D.C. Code § 34-2107, to include the impervious surface area as part of the basis upon which sanitary sewer service charges are determined, such an amendment could not extend to the United States. In 1973, Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. 93–198, 87 Stat. 774 (1973) (codified as amended at D.C. Code § 1-201.01, et seq.) (the Home Rule Act), which, among other things, "established a Council of the District of Columbia," Home Rule Act, § 401, and granted it "legislative power," id. § 404, subject to specific limitations set forth in Title VI of the Home Rule Act. See id. §§ 404, 601–04. Among these limitations, section 603(a)(3) in Title VI of the Home Rule Act provides:

> (a) The Council shall have no authority to pass any act contrary to the provisions of this act except as specifically provided in this act, or to—
>
> . . .
>
> > (3) enact any act, or enact any act to amend or repeal any act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District.

Id. (emphasis added). Therefore, the D.C. Council's amendment to the D.C. Code at D.C. Code § 34-2107 to include a property's impervious area as an additional basis upon which to determine sanitary sewer service charges, should be read to the exclusion of sanitary sewer service charges for the impervious area of a United States property, including the AFRH.

The United States' waiver of sovereign immunity to incur monetary damages is to be narrowly construed. See, e.g., RHI Holdings, Inc. v. United States, 142 F.3d 1459, 1461 (Fed. Cir. 1998). In RHI Holdings, the United States Court of Appeals for the Federal Circuit stated:

Waivers of sovereign immunity must be explicit, and cannot be implied. See United States v. Testan, 424 U.S. 392, 399, 96 S. Ct. 948, 953–54, 47 L. Ed. 2d 114 (1976) (citing United States v. King, 395 U.S. 1, 4, 89 S. Ct. 1501, 150203, 23 L. Ed. 2d 52 (1969)); see also Irwin v. Department of Veterans Affairs, 498 U.S. 89, 93, 111 S. Ct.453, 456, 112 L. Ed. 2d 435 (1990); cf. Seminole Tribe of Florida v. Florida, 517 U.S. 44, 55, 116 S. Ct. 1114, 1123, 134 L. Ed. 2d 252 (1996). Any statute which creates a waiver of sovereign immunity must be strictly construed in favor of the Government. See Sherwood, 312 U.S. at 590, 61 S. Ct. at 771.

RHI Holdings, Inc. v. United States, 142 F.3d at 1461; see also Lane v. Pena 518 U.S. 187, 192 (1996) ("[W]hen confronted with a purported waiver of the Federal Government's sovereign immunity, the Court will 'constru[e] ambiguities in favor of immunity." (alteration in original) (quoting United States v. Williams, 514 U.S. 527, 531 (1995)). Based on the forgoing, this court finds that the 1954 Act's waiver of sovereign immunity for sanitary sewer service charges applicable to the United States, should be construed so as to exclude stormwater or impervious area charges, and should be construed only to permit the United States to be charged sanitary sewer service charges which are "predicated on the value of water and water services received by such facilities of the Government of the United States." D.C. Code § 34-2112(a). This is because of the 1954 Act's separate definitions for stormwater sewage/sewer as opposed to sanitary sewage/sewer, section 212 of the 1954 Act's continuous use of "sanitary" sewer service charges, without mention of "stormwater" sewer service charges, and the absence of congressional action to amend section 212 of the 1954 Act to include a property's impervious area as an additional basis upon which to determine sanitary sewer service charges for the United States.

Although not claimed in the amended complaint filed in this court, and not argued for by the plaintiff in the above captioned case, the court notes that 33 U.S.C. § 1323, as enacted in the Clean Water Act, may be relevant to plaintiff's claims regarding stormwater charges. As indicated above, the statute at 33 U.S.C. § 1323(a) provides that federal entities "shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges." Id. (emphasis added). With respect to what is included in "reasonable service charges," the statute at 33 U.S.C. § 1323(c) states:

> For the purposes of this chapter, reasonable service charges described in subsection (a) include any reasonable nondiscriminatory fee, charge, or assessment that is--
>
> **(A)** based on some fair approximation of the proportionate contribution of the property or facility to stormwater pollution (in terms of quantities of pollutants, or volume or rate of

> stormwater discharge or runoff from the property or facility); and
>
> **(B)** used to pay or reimburse the costs associated with any stormwater management program (whether associated with a separate storm sewer system or a sewer system that manages a combination of stormwater and sanitary waste), including the full range of programmatic and structural costs attributable to collecting stormwater, reducing pollutants in stormwater, and reducing the volume and rate of stormwater discharge, regardless of whether that reasonable fee, charge, or assessment is denominated a tax.

Id. (emphasis in original).

In its amended complaint plaintiff makes no mention of the Clean Water Act, or any subsequent amendments to the Clean Water Act, or 33 U.S.C. § 1323 in particular, and instead relies solely on the 1954 Act as its basis for entitlement to stormwater charges incurred by the AFRH. Moreover, plaintiff appears to disagree with defendant's assertion that "[t]he substantive law the District must rely on for its claim for stormwater charges is 33 U.S.C. § 1323." As noted above, plaintiff argues:

> Contrary to the United States' position, the Federal Facilities Pollution Control provision of the Clean Water Act ("Federal Facilities Section"), 33 U.S.C. § 1323, does not control the instant issue of whether DC Water may demand payment for impervious area charges from the United States. Rather, this section governs water pollution and merely requires the Government to comply with all applicable law and to pay "reasonable service charges."

(capitalization in original). Plaintiff has not alleged in its amended complaint filed in this court entitlement to stormwater charges pursuant to 33 U.S.C. § 1323, and has specifically rejected reliance on the Clean Water Act as a basis for its recovery. Additionally, plaintiff has provided no evidence that any alleged stormwater charges were reasonable and in accordance with 33 U.S.C. § 1323. Moreover, as discussed above, nor does the 1954 Act allow plaintiff to recover for stormwater charges. The court, therefore, dismisses plaintiff's claim for stormwater charges, without prejudice.

Quantum Meruit

In plaintiff's amended complaint, plaintiff sets forth an alternative argument alleging entitlement to all payments alleged to be owed by the AFRH under a theory of quantum meruit. Plaintiff's amended complaint states: "There exists a contract between the United

States and DC Water as expressed through the District of Columbia Public Works Act," and that such contract "obligates the United States to pay for sewer services, including IAC [impervious area charge] charges, received from the District of Columbia as provided by DC Water." Plaintiff further asserts that "[t]he sewer services billed to AFRH-W are the kind of services that are typically paid for by individuals, businesses, and federal agencies in the District of Columbia." Plaintiff also asserts that "[t]he United States received valuable services from DC Water for AFRH," and that "[t]he United States accepted and enjoyed these services." Plaintiff also argues in its amended complaint that "[s]ince 2004, the United States has been aware that DC Water expected to be paid for the provision of sewer services to the buildings on AFRH-W's grounds."

"Quantum meruit is '[a] claim or right of action for the reasonable value of services rendered.'" United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1329 (Fed. Cir. 2006) (quoting Black's Law Dictionary 1276 (8th ed. 2004)). The United States Court of Appeals for the Federal Circuit distinguishes two types of quantum meruit claims: implied-in-law and implied-in-fact. See Int'l Data Prods. Corp. v. United States, 492 F.3d 1317, 1325 (Fed. Cir. 2007). An implied-in-law contract is

> a contract in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice. The Court of Federal Claims, however, lacks jurisdiction over contracts implied in law. 28 U.S.C. § 1491(a)(1) (2000). On the other hand, "[w]here a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a quantum valebant or quantum meruit basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract but rather under an implied-in-fact contract." United Pac. Ins. Co. v. United States, 464 F.3d at 1329-30.

Int'l Data Prods. Corp. v. United States, 492 F.3d at 1325-26; see also Perri v. United States, 340 F.3d 1337, 1343 (Fed. Cir. 2003) ("Recovery in quantum meruit, however, is based upon a contract implied in law." (citing Fincke v. United States, 230 Ct. Cl. 233, 246, 675 F.2d 289, 296 (1982)); Sanders v. United States, 252 F.3d 1329, 1334 (Fed. Cir. 2001); Reid v. United States, 143 Fed. Cl. 661, 671 (2019); Lee v. United States, 130 Fed. Cl. 243, 260 (2017). Thus, the Court of Federal Claims does not have jurisdiction over implied-in-law contract claims, but does have jurisdiction over express and implied-in-fact contracts.

Similarly, the United States Court of Appeals for the Federal Circuit stated at a later date:

> Recovery in quantum meruit is typically "based on an implied-in-law contract." Int'l Data Prods. Corp., 492 F.3d at 1325. Because the jurisdiction of the Claims Court over contract claims "extends only to contracts either express or implied in fact, and not to claims on contracts implied in law," Perri v. United States, 340 F.3d 1337, 1343 (Fed. Cir. 2003) (quoting Hercules, Inc. v. United States, 516 U.S. 417, 423, 116 S. Ct. 981, 134 L.

54

Ed. 2d 47 (1996), that court ordinarily does not entertain <u>quantum meruit</u> claims. However, we have on occasion approved the use of <u>quantum meruit</u> or <u>quantum valebant</u> as a measure of damages for breach of an implied in fact contract. <u>See Amdahl Corp.</u>, 786 F.2d at 393; <u>Barrett</u>, 242 F.3d at 1059–61.

<u>Seh Ahn Lee v. United States</u>, 895 F.3d 1363, 1373–74 (Fed. Cir. 2018).


Plaintiff in the above-captioned case appears to be trying to allege that "[t]here exists a contract between the United States and DC Water as expressed through the District of Columbia Public Works Act." The United States Court of Appeals for the Federal Circuit, however, has explained that "the general requirements of a binding contract with the United States are identical for both express and implied contracts." <u>Trauma Serv. Grp. v. United States</u>, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (citing <u>Russell Corp. v. United States</u>, 210 Ct. Cl. 596, 537 F.2d 474, 482 (1976); and <u>Thermalon Indus. v. United States</u>, 34 Fed. Cl. 411, 414 (1995)). These general requirements are "(1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance." <u>Lewis v. United States</u>, 70 F.3d 597, 600 (Fed. Cir. 1995) (quoting <u>City of El Centro v. United States</u>, 922 F.2d 816, 820 (Fed. Cir. 1990), <u>cert. denied</u>, 501 U.S. 1230 (1991)). "When the United States is a party, a fourth requirement is added: the government representative whose conduct is relied upon must have actual authority to bind the government in contract." <u>Id.</u> (internal quotation marks omitted). The United States Supreme Court has stated generally that "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" <u>Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.</u>, 470 U.S. 451, 465–66 (1985) (quoting <u>Dodge v. Bd. of Educ.</u>, 302 U.S. 74, 79 (1937)). As the Supreme Court cautioned <u>National Railroad</u>:

This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. <u>Indiana ex rel. Anderson v. Brand</u>, 303 U.S. 95, 104-105, 58 S. Ct. 443, 447-448, 82 L. Ed. 685 (1938). Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. Indeed, "'[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.'" <u>Keefe v. Clark</u>, 322 U.S. 393, 397, 64 S. Ct. 1072, 1074, 88 L. Ed. 1346 (1944) (quoting <u>Charles River Bridge v. Warren Bridge</u>, 11 Pet. 420, 548, 9 L. Ed. 773 (1837)). Thus, the party asserting the creation of a contract must overcome this well-founded presumption, <u>Dodge [v. Board of Education</u>, 302 U.S. 74,] 79 [(1937)], and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.

Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. at 466; see also Brooks v. Dunlop Mfg., Inc., 702 F.3d 624, 630-31 (Fed. Cir. 2012); XP Vehicles, Inc. v. United States, 121 Fed. Cl. 770, 787 (2015) ("As a preliminary matter, a federal statute or regulation does not inherently create a contractual relationship between an individual and the United States."); ARRA Energy Co. I v. United States, 97 Fed. Cl. 12, 27 (2011) ("There is a general presumption that statutes are not intended to create any vested contractual rights.").

"'[I]t is of first importance to examine the language of the statute,'" when trying to discern whether a particular statute creates an implied-in-fact contract. See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. at 466 (quoting Dodge v. Bd. of Educ., 302 U.S. at 78); see also Hanlin v. United States, 316 F.3d 1325, 1330 (Fed. Cir. 2003) (rejecting the moving party's argument that the text of the statute at issue "establish[ed] contractual intent on the government's part," because "[w]e discern no language in the statute or the regulation that indicates an intent to enter into a contract"). If the statute "'provides for the execution of a written contract on behalf of the state the case for an obligation binding upon the state is clear.'" Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. at 466 (emphasis in original) (quoting Indiana ex rel. Anderson v. Brand, 302 U.S. 95, 78 (1938)). "[A]bsent 'an adequate expression of an actual intent' of the State to bind itself, this Court simply will not lightly construe that which is undoubtedly a scheme of public regulation to be, in addition, a private contract to which the State is a party." Id. at 466-67 (internal citation omitted) (quoting Wisconsin & Michigan R. Co. v. Powers, 191 U.S. 379, 386-87 (1903)).

Section 212 of the 1954 Act, as amended by Congress, and codified at D.C. Code § 34-2112, contains no such clear contractual language, and, therefore, "absent some clear indication that the legislature intends to bind itself contractually," section 212 of the 1954 Act does not rebut "the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. at 465–66 (quoting Dodge v. Bd. of Educ., 302 U.S. at 79). Plaintiff's attempt to label the 1954 Act as creating an implied-in-fact contract, therefore, fails. Furthermore, the United States Court of Appeals for the Federal Circuit has stated that "[t]he assertion of quantum meruit as a basis for calculating damages cannot rescue an implied-in-fact theory of recovery that is otherwise not cognizable." Seh Ahn Lee v. United States, 895 F.3d at 1374. Therefore, because plaintiff cannot establish an implied-in-fact theory of recovery based the 1954 Act, plaintiff cannot establish a quantum meruit theory of recovery based on the 1954 Act.[13] Aside from stating that "[t]he United States received valuable services from DC Water for AFRH," and that "[t]he United States accepted and enjoyed these services," plaintiff's amended complaint in the above-captioned case does not allege any facts which could establish that the requirements giving rise to a contract have been met, namely, that there was (1) mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in offer and acceptance, and (4) actual authority of

---

[13] As noted above, this court does not have jurisdiction over implied-in-law contracts. See, e.g., Int'l Data Prods. Corp. v. United States, 492 F.3d at 1325-26.

the government representative whose conduct is relied upon to bind the government. See, e.g., Lewis v. United States, 70 F.3d at 600.

The court also notes that the 1938 Agreement entered into between the plaintiff and defendant's predecessors-in-interest, was not an agreement in which the United States agreed to pay for services rendered by the District. To the contrary, the 1938 Agreement, which was raised in this case as a defense for the United States, attempted to do the opposite, i.e., to release the United States from a future obligation to pay for "water from the water supply." As explained in the United States Court of Appeals for the Federal Circuit in Perri v. United States, 340 F.3d at 1344, "[w]e know of no case . . . in which either we, the Court of Claims, or the Court of Federal Claims has permitted quantum meruit recovery in the absence of some contractual arrangement between the parties." Id. The parties did not enter into any express contract or agreement in which the United States attempted to bind itself to pay for sewer services rendered by the District. Based on the above discussion, plaintiff claim for quantum meruit fails.

## CONCLUSION

In sum, section 212 of the 1954 Act, as currently amended and codified in the D.C. Code at section 34-2112, obligates the United States, including the AFRH, to pay for sanitary sewer services rendered to it by the District, provided that the District properly follows the statutorily prescribed steps required by the 1954 Act, and provided the District submits its annual, prospective estimates in accordance with Paragraph 212(b)(2). This is true whether or not the 1938 Agreement is construed to have included sewer services free of charge and in perpetuity to the AFRH, because the broad and mandatory language enacted by Congress in section 212 of the 1954 Act applies equally to the AFRH as it does to every other federal entity receiving sanitary sewer services from the District. Prior to 2019, however, the District had failed to include the AFRH in its annual estimates submitted pursuant to Paragraph 212(b)(2) of the 1954 Act.

With the exception of its 2019 FCSE for the fiscal year 2021, plaintiff has not met its obligations before the defendant's payment obligations become payable for AFRH usage to the named United States Treasury account equal to such estimated amounts for sanitary sewer services rendered to the AFRH. Nor has plaintiff triggered any payments to be executed by the United States Secretary of Treasury. Plaintiff, however, did comply with the submission requirements of section 212 of the 1954 Act with respect to its 2019 FCSE, and, therefore, the District is entitled to the payments which should have been executed by the Secretary of the Treasury on October 2, 2020, January 2, 2021, April 2, 2021, and July 2, 2021, constituting the AFRH's estimated sanitary sewer service charges for the 2021 fiscal year. Plaintiff is not entitled to any adjustments, because plaintiff did not include the AFRH in any of its previous FCSE's submitted for prior years, as plaintiff concedes. Even if plaintiff had included the AFRH, plaintiff would only be entitled to the adjustment between what it would have submitted for its 2018 fiscal year estimates, and the actual cost for sanitary sewer services provided to the AFRH for the 2018 fiscal year. As stated in section 212(c) of the 1954 Act, as currently amended and codified in the D.C. Code at section 34-2112(b)(2), "[t]he District's estimates on a yearly basis shall reflect such adjustments as are necessary to (A) account for actual usage variances from the estimated amounts for the fiscal year ending on September 30th

of the calendar year preceding April 15th." D.C. Code § 34-2112(b)(2). Because plaintiff did not include the AFRH in its FCSE for the 2018 fiscal year, or any year prior to its 2019 FCSE for the 2021 fiscal year, plaintiff is not entitled to an adjustment in the positive or negative direction. Furthermore, section 212 of the 1954 Act does not obligate an entity of the United States to compensate the District for stormwater or impervious area charges, and plaintiff has failed to allege or establish that it is entitled to such stormwater charges under 33 U.S.C. § 1323. Finally, plaintiff is not entitled to compensation for sewer services rendered to the AFRH under an alternative theory of quantum meruit, as plaintiff has not established that an implied-in-fact contract was created through section 212 of the 1954 Act.

Therefore, for the reasons stated above, defendant's motion to dismiss under RCFC 12(b)(1) and (6) is **GRANTED IN PART** and **DENIED IN PART**, to the extent that plaintiff is entitled its 2021 estimated sanitary sewer service charges as submitted in its 2019 FCSE, but not entitled to any other damages requested. As discussed above, plaintiff's claim for stormwater charges is **DISMISSED,** without prejudice. As also discussed above, plaintiff's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff is entitled to the amount listed, in its 2019 FCSE submission, which was estimated to be due by the AFRH for the fiscal year 2021, less stormwater charges, and less retrospective charges for prior years. Indeed, provided that DCWS' 2019 FCSE was properly submitted in accordance with section 212(b)(3) of the 1954 Act, as amended and codified at D.C. Code § 34-2112(b)(3), such net amount for the 2021 fiscal year was to have been executed by the Secretary of the Treasury to the AFRH "without further justification," and regardless of whether the AFRH executed such amounts into the named Treasury account for the Secretary to subsequently execute to the District. See D.C. Code § 34-2112(b). In the July 16, 2019 FCSE submission, the District of Columbia Water and Sewer Authority provided that its estimate for the AFRH for sewer charges for the 2021 fiscal year was $1,747,090.49, not including stormwater charges, and not including any retrospective charges. Therefore, in accordance with section 212(b)(1) of the 1954 Act, as it is currently amended and codified at D.C. Code § 34-2112(b)(1), the Secretary of Treasury was to have executed payment to DCWS, equal to one-quarter of $1,747,090.49, or $436,722.62, on each of October 2, 2020, January 2, 2021, April 2, 2021, and July 2, 2021, and, based on the record before the court, failed to do so,. Plaintiff's entitlement to the amounts listed above, however, is conditioned on plaintiff not having been previously compensated.

The court will schedule future proceedings by separate Order.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

58